UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE et al., <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR ROSS, in his official capacity as the Secretary of Commerce et al., <br><br> Defendants. | Civil Action No. 2:18-cv-03326-RMG (Consolidated with 2:18-cv-3327-RMG) <br><br><br> RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BY INTERVENOR-DEFENDANTS THE INTERNATIONAL ASSOCIATION OF GEOPHYSICAL CONTRACTORS, CGG SERVICES (U.S.) INC., GX TECHNOLOGY CORPORATION, SPECTRUM GEO INC., TGS-NOPEC GEOPHYSICAL COMPANY, WESTERNGECO LLC, AND THE AMERICAN PETROLEUM INSTITUTE |
| CITY OF BEAUFORT et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE et al., <br><br> Defendants. | |

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND.................................................................................................. 6

    A. Seismic Surveys Gather Geophysical Data with No Significant Effects............................6

    B. The MMPA Allows NMFS to Issue IHAs...........................................................................7

    C. NMFS Issued IHAs to the Five Exploration Companies in 2018........................................8

III. ARGUMENT ..................................................................................................... 9

    A. Preliminary Injunctive Relief Is an Extraordinary Remedy. ...............................................9

    B. The League's Request for Preliminary Injunctive Relief Is Premature Because
        BOEM Has Not Yet Issued a Permit. .................................................................................10

    C. The League's Motion Should Be Denied Because It Fails to Demonstrate a
        "Likelihood" of Irreparable Harm. ....................................................................................11

        1. The League's Alleged Harms Are Speculative and Contradicted by 80 Years
           of Seismic Surveys Without Any Evidence of Impacts to Marine Life. .....................12

        2. The League's Claims of Irreparable Injury Are Legally and Factually Flawed..........14

    D. The League's Motion Should Also Be Denied Because the League Is Unlikely to
        Succeed on the Merits.......................................................................................................26

        1. The League Is Unlikely to Prevail on Its MMPA Claims............................................26

        2. The League Is Unlikely to Prevail on Its ESA Claims. ...............................................31

        3. The League Is Unlikely to Prevail on Its NEPA Claims. ............................................34

    E. The Balance of the Equities and Public Interest Weigh Against an Injunction.................35

IV. CONCLUSION................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Alaska Wilderness League v. Jewell*,
    116 F. Supp. 3d 958 (D. Alaska 2015) ....................................................................35

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)...................................................................................................35

*Balt. Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983).......................................................................................................5

*Bloodgood v. Garraghty*,
    783 F.2d 470 (4th Cir. 1986) ....................................................................................12

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)...................................................................................................35

*CBD v. Hays*,
    No. 2:15-cv-01627-TLN, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ...................25

*CBD v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ...............................................................................30, 35

*CBD v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ...............................................................................27, 28

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).....................................................................................................10

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ..................................................................................10

*De La Fuente v. S.C. Democratic Party*,
    164 F. Supp. 3d 794 (D.S.C. 2016)...........................................................................10

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ....................................................................................23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...................................................................................................16

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975)..............................................................................16, 17

*Hodges v. Abraham*,
    253 F. Supp. 2d 846 (D.S.C. 2002)................................................................5, 11, 13, 24

*Idaho Rivers United v. United States Army Corps of Engineers*,
    156 F. Supp. 3d 1252 (W.D. Wash. 2015)...................................................12, 16, 17

*In Def. of Animals v. U.S. Dep't of Interior*,
    737 F. Supp. 2d 1125 (E.D. Cal. 2010)..................................................................25

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................................19

*Manning v. Hunt*,
    119 F.3d 254 (4th Cir. 1997) ......................................................................5, 11, 24

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) (per curiam)...........................................................................9

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)...............................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................................26, 27

*Munaf v. Geren*,
    553 U.S. 674 (2008).............................................................................................6, 9

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
    854 F.3d 1236 (10th Cir. 2017) .............................................................................11

*Native Vill. of Point Hope v. Minerals Mgmt. Serv.*,
    564 F. Supp. 2d 1077 (D. Alaska 2008) ................................................................34

*Natural Resources Defense Council v. Evans*,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003) ..........................................................15, 28

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    817 F. Supp. 2d 1290 (D. Or. 2011) ................................................................17, 19

*NWF v. NMFS*,
    422 F.3d 782 (9th Cir. 2005) ................................................................................17

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ..............................................................................19

*Pac. Coast Fed. of Fishermen's Ass'ns v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008).................................................................16

OPPOSITION TO SCCCL'S MOTION
FOR A PRELIMINARY INJUNCTION         - iii -

*Power Mobility Coal. v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005) ...................................................................11

*Real Truth v. Fed. Election Comm'n*,
    575 F.3d 342 (4th Cir. 2009) ...........................................................................10

*S. Utah Wilderness All. v. Thompson*,
    811 F. Supp. 635 (D. Utah 1993) .....................................................................17

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ......................................................................31, 32

*SAS Inst., Inc. v. World Programming Ltd.*,
    874 F.3d 370 (4th Cir. 2017) ...........................................................................10

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ...............................................................................32

*Texas v. United States*,
    523 U.S. 296 (1998) ....................................................................................10, 33

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) .............................................................................9

*Water Keeper All. v. U.S. Dep't of Def.*,
    271 F.3d 21 (1st Cir. 2001) .........................................................................16, 19

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................................... passim

*Wis. Gas Co. v. F.E.R.C.*,
    758 F.2d 669 (D.C. Cir. 1985) ..........................................................2, 11, 12, 14

*Zepeda v. INS*,
    753 F.2d 719 (9th Cir. 1983) ...........................................................................34

**Statutes**

16 U.S.C. § 1362(13) ..............................................................................................7

16 U.S.C. § 1362(18)(A) .....................................................................................7, 15

16 U.S.C. § 1371(a) ................................................................................................7

16 U.S.C. § 1371(a)(5)(A)(i) ................................................................................30

16 U.S.C. § 1371(a)(5)(A)(i)(I) ...........................................................................30

16 U.S.C. § 1371(a)(5)(D) .....................................................................................7

OPPOSITION TO SCCCL'S MOTION
FOR A PRELIMINARY INJUNCTION       - iv -

16 U.S.C. § 1371(a)(5)(D)(i) .................................................................................26, 29

43 U.S.C. § 1332(3) ..................................................................................................35

**Regulations**

40 C.F.R. § 1508.27 ...................................................................................................35

50 C.F.R. §§ 216.101-216.108...................................................................................30

50 C.F.R. § 216.103 ...................................................................................................30

40 C.F.R. § 1502.20 ...................................................................................................34

71 Fed. Reg. 43,925 (Aug. 2, 2006)...........................................................................28

73 Fed. Reg. 33,212 (June 11, 2008)..........................................................................28

77 Fed. Reg. 19,321 (Mar. 30, 2012)............................................................................8

79 Fed. Reg. 42,815 (July 23, 2014).............................................................................8

79 Fed. Reg. 57,512 (Sept. 25, 2014) ....................................................................1, 28

79 Fed. Reg. 65,378 (Nov. 4, 2014)............................................................................28

80 Fed. Reg. 27,635 (May 14, 2015) ..........................................................................13

81 Fed. Reg. 40,852 (June 23, 2016)..........................................................................28

81 Fed. Reg. 66,628 (Sept. 28, 2016)..........................................................................28

81 Fed. Reg. 2174 (Jan. 15, 2016)..............................................................................13

82 Fed. Reg. 17,209 (Apr. 10, 2017) ..........................................................................28

82 Fed. Reg. 26,244 (June 6, 2017) ..............................................................................8

82 Fed. Reg. 32,330 (July 13, 2017)...........................................................................19

82 Fed. Reg. 32,330 (July 13, 2017)...........................................................................28

83 Fed. Reg. 19,532 (May 3, 2018) ............................................................................19

83 Fed. Reg. 27,954 (June 15, 2018) ..........................................................................13

83 Fed. Reg. 39,692 (Aug. 10, 2018)....................................................................13, 32

83 Fed. Reg. 57,076 (Nov. 14, 2018)..........................................................................22

OPPOSITION TO SCCCL'S MOTION
FOR A PRELIMINARY INJUNCTION          - v -

83 Fed. Reg. 63,268 (Dec. 7, 2018) ......................................................................... passim

84 Fed. Reg. 7,023 (Mar. 1, 2019) ................................................................................ 32

**Other Authorities**

*American Heritage Dictionary* 1701 (3d ed. 1992) ........................................................ 29

*Cambridge Dictionary,*
    https://dictionary.cambridge.org/us/dictionary/english/small ................................ 29

H.R. Rep. No. 97-228 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1458 .......................... 27

*MacMillan Dictionary,*
    https://www.macmillandictionary.com/us/dictionary/american/small_1 ................ 29

*Oxford Dictionary*, https://en.oxforddictionaries.com/definition/small ........................ 29

Kraus and Rolland (eds.), *The Urban Whale* (2007) ..................................................... 20

*Webster's Third New International Dictionary* 2149 (2002) ......................................... 29

## I.  INTRODUCTION

Tens of thousands of seismic surveys have occurred throughout the world over the last 80 years using conventional compressed-air arrays. This includes thousands of seismic surveys on the U.S. outer continental shelf ("OCS") alone, consisting of more than 3,122,360 linear miles of 2D seismic surveys.[1] In all of that time, and across millions of miles, there is no credible evidence that seismic survey sound has had any significant impacts on marine mammals or the marine environment. In the Atlantic alone, there were over 213,936 linear miles of seismic surveys in the 1970s and early 1980s, including extensive surveys in North Atlantic right whale habitat and beaked whale habitat. There was no evidence of environmental impact or impact to marine mammals from those surveys. At least five additional seismic surveys have been authorized in the Atlantic since 2014, including seismic surveys in right whale and beaked whale habitat, again with no evidence of any impact to marine mammals or the environment. *See, e.g.*, 79 Fed. Reg. 57,512, 57,538 (Sept. 25, 2014).

Despite 80 years of evidence to the contrary, Plaintiffs South Carolina Coastal Conservation League et al. (collectively, the "League" or "SCCCL") claim that the five surveys proposed by Intervenor-Defendants CGG Services (U.S.) Inc., GX Technology Corporation, Spectrum Geo Inc., TGS-Nopec Geophysical Company, and WesternGeco LLC (collectively, the "Exploration Companies") will cause irreparable injury to the marine environment, and seek to enjoin five incidental harassment authorizations ("IHAs") issued by the National Marine Fisheries Service ("NMFS") under the Marine Mammal Protection Act ("MMPA"). Although there has not been a single documented marine mammal mortality attributed to sound from seismic surveys, the League protests that these surveys "may injure or kill individual whales and

---

[1] *See* Declaration of Nikki Martin ¶ 5.

harm entire populations" of marine mammals, will push the North Atlantic right whale to extinction, and will cause population-level injuries to highly abundant beaked whale species. SCCCL Br. (Dkt. 124-1) at 5.

The League's request for injunctive relief should be denied because these hyperbolic and speculative claims have no merit. The *sine qua non* for obtaining injunctive relief is a demonstration by the movant "that irreparable injury is 'likely' to occur" absent an injunction. *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). The burden is on the movant to "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id*. The League has not made and cannot make that showing here. The harms the League predicts have *never* been demonstrated, and the League provides no credible reason why the present surveys will produce effects that have never been observed. Nor could it. As detailed below, the IHAs include a suite of mitigation and avoidance measures, and area closures, designed by NMFS to prevent even the remote possibility of any irreparable injury to marine mammals or the environment. *See*, *e.g.*, Declaration of Ryan Steen, Ex. A at 77 ("NMFS has minimized possible impacts to right whales . . . and believes the possibility of significant impacts resulting from the proposed activity to be unlikely.").

Without any evidence of past injury, the League tries to manufacture injury by pointing to the "take" of marine mammals authorized by the IHAs, and claiming that this "take" proves that the Exploration Companies will "harass and seriously injure or kill" tens of thousands of marine mammals if the Court does not intervene. SCCCL Br. at 29. The League mischaracterizes the IHAs and the nature of "take" under the MMPA. The IHAs *do not authorize any serious injury or mortality*, and NMFS does not expect any such injury or mortality to occur. 83 Fed.

Reg. 63,268, 63,275 (Dec. 7, 2018) ("No mortality is expected to occur as a result of the planned surveys, and there is no scientific evidence indicating that any marine mammal could experience mortality as a direct result of noise from geophysical survey activity."). Instead, the five IHAs combined authorize only 69 instances of "Level A harassment" which (by definition) have only the "potential to injure" marine mammals. *Id*. at 63,340, Table 6.[2] And as for the 69 "potential" injuries, none involve North Atlantic right whales or beaked whales, and most are unlikely to occur at all (or would be so small as to be almost imperceptible). *Id*. at 63,338, 63,340; *See* Declaration of Bob Gisiner ¶ 70. The rest of the authorized take is for "Level B harassment" which (by definition) is for minor "potential" disturbances in behavior (*e.g.*, avoiding sound) that do not have the "potential to injure." 83 Fed. Reg. at 63,268, 63,340. The League's claim that thousands of marine mammals will be injured or killed is false.

And frankly, the League should know better than to make outrageous claims of irreparable injury based on Level B (or even Level A) harassment authorizations. The League's expert (Dr. Scott Kraus) decries these surveys as an "existential threat" to the remaining 411 (or so) North Atlantic right whales, even though the five combined IHAs authorize *zero* Level A right whale harassments and *only 19* Level B right whale harassments. To place the insignificance of those numbers in context, Dr. Kraus himself presently holds a permit authorizing him to "take" *50 right whales per year for five years* by Level A harassment (pursuing right whales, including non-neonate calves, to within 5 to 15 meters by boat and then shooting them with a crossbow) and *5,000 right whales per year* by Level B harassment, thereby

---

[2] Spectrum revised its plans resulting in lower harassments of all marine mammals, and therefore the numbers in the Federal Register tables are higher than actually authorized. The actual authorized numbers are presented in the IHAs. Steen Decl., Exs. B-F.

harassing the entire North Atlantic right whale population as much as *10 times per year*. Steen Decl., Ex. G at 88.[3] The League's other right whale expert (Dr. Douglas Nowacek) previously held a permit allowing *80 Level A right whale takes per year for five years* (pursuing whales by boat and attaching trackers), and an additional 90 Level B harassments per year. *Id.*, Ex. H at 33, Ex. I at 4. Indeed, in one five-year period, NMFS authorized Dr. Kraus and other researchers to "take" the 411 or so remaining right whales as many as *51,590 times in a five-year period* (and many of those takes were by Level A harassment). *Id.*, Ex. G at 78. Although this research may be well-intended and well-purposed, it undeniably has an adverse impact. *Id.* ("[R]esearch has the ability to contribute to or even exacerbate the stress response to marine mammals generated from other threats occurring in the action area."); *id.* at 84-85 (discussing example where research vessel struck a right whale resulting in injury); *id.* at 95-96 (discussing death of dolphin after being hit with biopsy dart). The League's claim that the status of the right whale is so perilous that *any* increased stress will propel the species to extinction is not credible in light of the fact that its own experts harass the right whale population thousands of times per year.

The League's fears of harm to beaked whales are equally unfounded. The League's own beaked whale experts concede that there is no documented evidence or scientific studies showing that beaked whales react adversely to seismic sound. Without evidence that seismic surveys will impact beaked whales (and despite 80 years of experience evidencing they will not), the League's experts speculate, based on sonar studies, that beaked whales *could* react negatively to seismic sound. However, although beaked whales are sensitive to mid-frequency sounds like

---

[3] For five years (September 2010 to September 2015), Dr. Kraus was authorized to conduct 50 Level A harassments per year, including 20 Level A harassments per year on calves under six months old, and an additional 2,000 Level B harassments per year. *Id.*, Ex. H at 33.

sonar, seismic survey sounds are entirely different in character and intensity, and occur predominantly at low frequencies. Giesner Decl. ¶¶ 27-32, 55, 83-91. It is well settled that "fear of speculative or remote future injury cannot constitute irreparable harm." *Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002) (citing *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997)).

Putting the League's hyperbole and speculation aside, the fact of the matter is that NMFS spent years working on these IHAs, carefully considered all of the League's concerns (through two rounds of public comment—one required and one voluntary), and concluded that there is no real possibility of injury to beaked whales or to North Atlantic right whales, and that the *potential* 69 injuries (to other marine species) would be very minor if they occurred at all. 83 Fed. Reg. at 63,336. NMFS's conclusions are well supported by the scientific literature and reports demonstrating that marine mammals exhibit only minor behavioral responses to seismic surveys and that no meaningful, long-term consequences result from these responses. *See* Giesner Decl. §§ III, IV. Although the League's experts strain to reach a different result, those opinions go against the weight of history and the opinions of the federal agency entrusted by Congress to protect marine mammals. The League has failed to demonstrate that irreparable harm is likely absent an injunction, and its motion should be denied for this reason alone.

In addition, the League's motion should be denied because it also fails to establish a likelihood of success on the merits. The League must demonstrate that NMFS's actions are arbitrary and capricious under the Administrative Procedure Act ("APA"). The League's burden is particularly difficult here because NMFS's decisions involve complex scientific evaluations where "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). The League's merits arguments amount to little more than

second-guessing the agency's scientific determinations and mischaracterizing the record. As set

forth below, the League does not demonstrate that it is likely to prevail on these claims.

    For all of these reasons, and those discussed below, the League's motion should be

denied. The "'extraordinary and drastic remedy'" requested by the League is not warranted.

*Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).

## II.  BACKGROUND

### A.    Seismic Surveys Gather Geophysical Data with No Significant Effects.

    Seismic surveys utilize acoustic waves to characterize the geological features below the

seafloor. Seismic surveys in the ocean are carried out by vessels that tow an array of different

sized acoustic sound sources, typically consisting of compressed-air chambers resembling

SCUBA tanks (but with much less volume) that emit a very brief (less than 0.1 second) acoustic

pulse into the water every six to 20 seconds. Gisiner Decl. ¶¶ 14-18. The pulse from the acoustic

array reflects off the seafloor and subsurface layers and the return signal is recorded by a towed

listening device which can later be analyzed to create an image of the seafloor's underlying

geological layers. *Id*. A seismic survey vessel typically travels at four to five knots along a set

survey track line, acquiring seismic data along the way. *Id*. The vessels move in a straight line

for hours or even days before making a turn, and may not return to a given vicinity for 16 to 72

hours, and then may be hundreds or thousands of meters from the previous track line. *Id*.

    The effects of seismic surveys on marine mammals have been the subject of extensive

observation and study. *Id*. §§ III, IV. Some marine mammals show no apparent reaction (*e.g.*,

some dolphins will actually bow-ride in front of active seismic vessels), while others make very

minor alterations in their migratory paths (*e.g.*, a 200 m detour in a 5,000-8,000 km migration) in

response to the sound. *Id*. ¶¶ 51-52. There are no documented marine mammal injuries caused by

sound from seismic surveys and there has been no demonstration that temporary behavioral

modifications that may be caused by seismic sound have anything more than a negligible impact to marine mammal populations. *Id*. §§ III, IV, V. These conclusions have been reached repeatedly by federal agencies over decades of authorizing marine mammal take incidental to seismic surveys.

**B.      The MMPA Allows NMFS to Issue IHAs.**

The MMPA was passed in 1972, and generally prohibits the "take" of marine mammals, which is defined in the statute as "to harass, hunt, capture, or kill or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. §§ 1362(13), 1371(a). The MMPA further defines harassment as "any act of pursuit, torment, or annoyance which (i) has *the potential to injure* a marine mammal or marine mammal stock in the wild" (emphasis added) (known as "Level A harassment"); or "(ii) has *the potential to disturb* a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering" (known as "Level B harassment"). 16 U.S.C. § 1362(18)(A) (emphasis added). Despite the MMPA's general prohibition on taking marine mammals, the statute allows NMFS to permit the take of *small numbers* of marine mammals through IHAs, if the agency determines that such incidental harassment will have a *negligible impact* on the species or stock. *See* 16 U.S.C. § 1371(a)(5)(D).

NMFS employs models to estimate the numbers of marine mammals that may experience Level A and Level B harassment from sound. *See* Gisiner Decl. § V. NMFS typically models Level B harassment using a criterion of 160 decibels ("dB"), which is the threshold at which a marine mammal could perceive the sound (if it were present in the area) and could respond to that sound. *Id*. ¶ 72. NMFS typically models Level A harassment using two criteria, adjusted for marine mammal hearing groups, which represent the levels at which it is possible that certain marine mammal species could experience minor, but perceptible, changes in hearing. *Id*. ¶ 70.

The modeling used to generate estimates of incidental take by harassment incorporates numerous conservative assumptions that generally result in highly precautionary estimates. *Id*. ¶¶ 69-71.

## C.    NMFS Issued IHAs to the Five Exploration Companies in 2018.

On November 30, 2018, NMFS issued the five IHAs, pursuant to the MMPA.[4] The process began in 2012, when the Bureau of Ocean and Energy Management ("BOEM")—the entity with authority to issue permits for seismic surveys on the OCS—issued a Draft Programmatic Environmental Impact Statement ("PEIS") to evaluate the potential environmental effects of geological and geophysical activities, including seismic surveys, on the Mid- and South-Atlantic OCS. *See* 77 Fed. Reg. 19,321 (Mar. 30, 2012). After responding to extensive public comments, BOEM issued a Final PEIS in 2014. 79 Fed. Reg. 42,815 (July 23, 2014). In 2015 and 2016, the Exploration Companies responded to the PEIS by submitting applications to BOEM for permission to conduct two-dimensional seismic surveys on the Atlantic OCS in support of oil and gas exploration. At various times, the companies also submitted IHA applications to NMFS requesting authorization to take marine mammals incidental to their respective proposed seismic surveys, which, together, totaled 148,697 linear kilometers of proposed surveying (later reduced). *See* 82 Fed. Reg. 26,244, 26,249, Table 1 (June 6, 2017).

As part of its evaluation of the applications, NMFS prepared a Biological Opinion ("BiOp"), pursuant to Section 7 of the Endangered Species Act ("ESA"), assessing the potential impacts of the five proposed seismic surveys on species listed under the ESA, including the North Atlantic right whale. Steen Decl., Ex. J. The BiOp concluded that the five surveys, individually or collectively, were not likely to jeopardize listed species under the ESA. *Id*., Ex. J

---

[4] The unusually long and complicated history leading up to that approval (which the League mischaracterizes) is set forth in the Declaration of Nikki C. Martin, ¶¶ 10-18.

at 111. NMFS also prepared a supplemental environmental assessment ("EA") under the

National Environmental Policy Act ("NEPA") to supplement BOEM's analysis in the PEIS, and

evaluated the specific impact of the five IHAs in light of new available science and information.

*Id.*, Ex. A. Based on the EA, NMFS concluded that the five surveys "would each have a

negligible impact on the affected mammal species or stocks under the MMPA" and cumulatively

would have no significant impact to marine mammals or their habitat. *Id.*, Ex. K at 6-8.

 To further ensure against impacts, each of the five IHAs include a suite of mitigation and

monitoring measures. These measures include but are not limited to: constant visual monitoring

by trained protected species observers; passive acoustic monitoring to detect vocalizing marine

animals during low visibility and nighttime conditions; buffer and exclusion zones of 500, 1000,

and 1500 meters in which a vessel will shut down survey operations if a marine mammal enters

the zone; ramp-up (soft-start) procedures that gradually increase the sound level at the start of a

period of surveying; and time-area closures to avoid surveying near sensitive whale foraging and

breeding areas or migration routes. *Id.*, Ex. B at 1-16; 83 Fed. Reg. 63,341-57.

## III. ARGUMENT

**A.**   **Preliminary Injunctive Relief Is an Extraordinary Remedy.**

 Issuance of preliminary injunctive relief is an "'extraordinary and drastic remedy.'"

*Munaf*, 553 U.S. at 689 (citation omitted). An injunction can only issue on a "'clear showing'"

and "substantial proof" that an injunction is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997) (per curiam). The moving party must establish each of the following: "(1) a clear showing

that it will likely succeed on the merits; (2) a clear showing that it is likely to be irreparably

harmed absent preliminary relief; (3) the balance of equities tips in favor of the moving party;

and (4) a preliminary injunction is in the public interest." *United States v. South Carolina*, 720

F.3d 518, 533 (4th Cir. 2013) (internal quotation marks and citations omitted). Each of these four

requirements "must be fulfilled as articulated" to warrant injunctive relief. *De La Fuente v. S.C. Democratic Party*, 164 F. Supp. 3d 794, 798 (D.S.C. 2016) (citing *Real Truth v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009)). Moreover, "regardless of the other factors, '[t]he equitable remedy [of an injunction] is unavailable absent a showing of irreparable injury.'" *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386 (4th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

**B.    The League's Request for Preliminary Injunctive Relief Is Premature Because BOEM Has Not Yet Issued a Permit.**

As an initial matter, the League's request for a preliminary injunction is unripe because BOEM has not yet issued a permit under the Outer Continental Shelf Lands Act ("OCSLA"). Until that happens, the Exploration Companies cannot conduct seismic surveys, and there is no possibility of any harm to the League's members unless and until such a permit issues. Additionally, because BOEM has the authority to impose its own conditions on permits, there is no way to know at this time the exact scope of the surveys BOEM will authorize and therefore the scope of any potential impact that may occur. In short, irreparable harm from future surveys is not *likely* to occur when the Exploration Companies have no permit to conduct surveys and the potential permit conditions are not known. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) ("At the time Plaintiffs sought the preliminary injunction, none of the irreparable harms they sought to prevent were likely. Their alleged irreparable harms hinged on future [Department of Agriculture] decisions, and nothing prevented Plaintiffs from filing a new legal challenge if and when those decisions were made."). The League's motion should therefore be denied, pending issuance of permits by BOEM. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events . . . ." (citation and internal quotation marks omitted)).

**C.    The League's Motion Should Be Denied Because It Fails to Demonstrate a "Likelihood" of Irreparable Harm.**

A clear demonstration of irreparable harm to the plaintiff "'is the single most important prerequisite for the issuance of a preliminary injunction.'" *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017) (citation omitted). The League must show that irreparable harm is "likely" and not merely "possible." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "[P]roving 'irreparable injury' is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—*not theoretical*—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (emphasis added) (quoting *Wis. Gas Co.*, 758 F.2d at 674). "A fear of speculative or remote future injury cannot constitute irreparable harm," and instead "[t]here must be a likelihood that immediate irreparable harm will occur." *Hodges*, 253 F. Supp. 2d at 864 (citing *Manning*, 119 F.3d at 263).

The League claims that its members' research and aesthetic interests will be irreparably harmed because the planned seismic surveys will cause irreparable harm to marine mammals. SCCCL Br. at 33-34. Specifically, the League argues that "the authorized seismic blasting will harass and injure marine mammals hundreds of thousands of times," and that "seismic blasting will cause even more severe consequences for North Atlantic right whales and beaked whales." *Id*. at 30.[5] As set forth below, these arguments have no merit.

---

[5] The League also provides an expert declaration from Dr. Aaron Rice which opines that the surveys will cause acute and chronic injuries to fishes and invertebrates. However, the League does not argue this point in its memorandum and any such argument has been waived. In any event, such an argument is not credible. *See* 83 Fed. Reg. at 63,326; Gisiner Decl. §§ VI.C, VI.D.

1.    **The League's Alleged Harms Are Speculative and Contradicted by 80 Years of Seismic Surveys Without Any Evidence of Impacts to Marine Life.**

The League's claims ring hollow in light of 80 years without any evidence that seismic survey sound irreparably harms marine mammals. The League is required to "provide proof" that (1) "the harm has occurred in the past and is likely to occur again," or (2) "the harm is certain to occur in the near future." *Wis. Gas Co.,* 758 F.2d at 674; *see also Bloodgood v. Garraghty*, 783 F.2d 470, 476 (4th Cir. 1986) (same). As the Supreme Court explained, this burden is particularly difficult to meet when, as here, the defendant is not conducting "a new type of activity with completely unknown effects on the environment." *Winter*, 555 U.S. at 23 (reversing injunction for "training exercises that have been taking place in SOCAL for the last 40 years"). Relying on this precedent, the district court in *Idaho Rivers United v. United States Army Corps of Engineers*, 156 F. Supp. 3d 1252 (W.D. Wash. 2015), rejected speculative claims of injury to lamprey and endangered salmon from a project where the Corps had "been maintaining the navigation channel on the lower Snake River for more than 50 years," and had dredged the same area 10 years earlier without objection or evidence of irreparable harm. *Id*. at 1264 n.11.

Here too, the League cannot meet its burden because seismic surveys have been occurring for more than 80 years, and the effects of those surveys have been well-studied and well-documented. *See* Gisiner Decl. §§ III, IV. On the U.S. OCS alone there have been thousands of seismic surveys covering at least 3,122,360 linear miles. Martin Decl. ¶ 5. Tens of thousands of similar surveys have occurred worldwide. *Id*. ¶ 8.  The Atlantic OCS has had more than 213,936 linear miles of seismic surveys in the 1970s and 1980s, and at least five seismic surveys have been authorized on the Atlantic OCS since 2014. *Id*. ¶ 9; Steen Decl., Ex. L at 25.

The harms feared by the League have *never* materialized. Far from it.  For example, whale populations in the Pacific Ocean *increased* through a 20-year period of extensive seismic

surveys off the West Coast, with the gray whale population increasing during that time at

unprecedented rates. *Id.* ¶¶ 63-64. Likewise, seismic surveys have been regularly conducted in

the Arctic Ocean for decades, with regular monitoring and reporting to NMFS under the auspices

of MMPA incidental take authorizations, and during this lengthy period of acoustic exposures,

the endangered bowhead whale population consistently increased in abundance to the point that

it is believed to have reached carrying capacity. *Id.* ¶ 65, Ex. B. In the last five years, seismic

surveys have regularly been conducted in the Atlantic Ocean off the coast of North Carolina,

New York, New Jersey, and Massachusetts using the same technology that would be used for the

surveys proposed by the Exploration Companies, all without any evidence of harm to marine

mammals.[6] These surveys have all been subject to careful observation with no reports of marine

mammal injuries. *See, e.g.,* Steen Decl., Ex. Q (USGS, Protected Species Mitigation and

Monitoring Report, 2018, with *zero* observed Level A harassment events and *zero* right whale

sightings). The League's speculation that the present surveys will have different, *never-before-*

*observed* results is no basis for injunctive relief. *Hodges*, 253 F. Supp. 2d at 864 ("A fear of

speculative or remote future injury cannot constitute irreparable harm.").

Moreover, the potential effects of seismic surveys have been extensively observed and

studied, and are not a mystery. For example, a recent controlled study in Australia showed that

the typical behavioral response for a migrating humpback whale (on a 5,000 to 8,000 km

---

[6] *See* 83 Fed. Reg. 39,692 (Aug. 10, 2018) (IHA issued to United States Geological Survey for
seismic survey to be conducted in Northwest Atlantic Ocean); 83 Fed. Reg. 27,954 (June 15,
2018) (IHA issued to Scripps Institution of Oceanography for marine seismic survey in
Northwest Atlantic Ocean); 81 Fed. Reg. 2,174 (Jan. 15, 2016) (IHA issued to Lamont-Doherty
Earth Observatory for seismic survey in South Atlantic Ocean); 80 Fed. Reg. 27,635 (May 14,
2015) (IHA issued to Lamont-Doherty Earth Observatory for seismic survey in Northwest
Atlantic Ocean).

journey) exposed to seismic sound was to deviate from its path by about 200 meters, followed by immediate resumption of normal behavior. *Id.* ¶ 51. Similar results have been observed for gray whales in California and Alaska. *Id.* ¶ 52. This kind of minor disruption is a daily part of life for marine mammals, whether altering course to avoid natural hazards (*e.g.*, predators) or anthropogenic sources (*e.g.*, vessels). *Id.* ¶ 51. Indeed, one of the League's experts (Dr. Peter Tyack) previously testified (when defending his own permit) that the scientific data predicts the same response—"a deviation of migrating gray whales about 100 m around the sound source"—and that it was "hard to conceive how such a minor change . . . could be considered to pose an adverse impact." Steen Decl., Ex. M ¶ 30. Similarly, the IHAs regularly issued by NMFS for many years require comprehensive observation and reporting of effects, which has shown results similar to those observed in these studies.

The League must provide "proof"—not alarmist conjecture—that "the harm has occurred in the past and is likely to occur again." *Wis. Gas Co.,* 758 F.2d at 674. The League has failed to do so, and its motion should be denied.

>**2.**    **The League's Claims of Irreparable Injury Are Legally and Factually Flawed.**

>>**a.**    **Incidental Harassment of Marine Mammals Does Not Irreparably Injure the League or Its Members.**

Without evidence of past harm, the League tries to manufacture harm by pointing to the "takes" authorized by the IHAs. The League urges that *any harassment or possible injury* to marine mammals "constitutes irreparable harm," and an injunction is warranted because "NMFS's own estimates" show that the surveying will "harass and injure marine mammals hundreds of thousands of times." SCCCL Br. at 30. But, this is precisely the "alarmist" rhetoric the League's own expert (Dr. Tyack) previously testified "stems from a misunderstanding of the language of U.S. permits." Steen Decl., Ex. M ¶ 30.

The surveys are not going to "harass and injure marine mammals hundreds of thousands of times." The surveys have the "potential to injure" only 69 marine mammals in total, all of which are expected to be minor if they happen at all, and this estimate is calculated *without considering mitigation measures*. 83 Fed. Reg. at 63,336-40; *see* Gisiner Decl. ¶ 70 (explaining that the likelihood of actual hearing damage is remote, and at most would be a nearly imperceptible impact on hearing thresholds). The remaining impacts are for the "potential" to *disturb* marine mammals, not *injure* them. Level B harassment, by definition, does not have even the "potential" to cause injury. 16 U.S.C. § 1362(18)(A). And while the Level B disturbance numbers, when tallied together, number in the thousands, that is because many of the species are highly abundant, and the numbers are based on the *potential* to disturb (not actual disturbances) and estimated using a set of precautionary assumptions. Gisiner Decl. ¶¶ 68-72. Indeed, even whale research activities can quickly add up to tens and even hundreds of thousands of instances of Level B harassment. *See* Steen Decl., Ex. G at 78 (approved five-year research "takes" of 111,396 humpback whales, 66,040 fin whales, 51,590 right whales, and 46,705 sperm whales).

The League cites *Natural Resources Defense Council v. Evans*, 279 F. Supp. 2d 1129 (N.D. Cal. 2003), for its claim that "certain harassment and possible injury of marine mammals" warrants injunctive relief. SCCCL Br. at 29. But the League's reliance on that case is misplaced because the case was decided *before* the Supreme Court in *Winter* (also addressing alleged harm to marine mammals) held that the injury must be "likely" and not merely "possible." *Winter*, 555 U.S. at 22.[7] Level A harassment has only the "potential" to injure a marine mammal, and is not therefore "likely" injury. Level B harassment does not even have the "potential" to injure marine

_____

[7] The other two cases cited by the League for this erroneous standard were both unpublished and decided prior to *Winter*. *See* SCCCL Br. at 29-30.

mammals. NMFS's authorization of Level A and Level B harassment therefore provides no basis for an injunction.

Moreover, the relevant inquiry is not harm to the environment (or marine mammals), but harm to the plaintiffs. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (party must show "injury to the plaintiff" rather than "injury to the environment"). Plaintiffs seeking the extraordinary relief of an injunction must show that they themselves are likely to suffer irreparable harm absent an injunction. *See Winter,* 555 U.S. at 20 (plaintiff must establish "that *he* is likely to suffer irreparable harm" (emphasis added)); *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 156 (2010) ("'[P]laintiff must demonstrate . . . that *it* has suffered an irreparable injury.'" (emphasis added; citation omitted)).

Accordingly, not all harm to the environment or even harm to endangered species warrants injunctive relief. *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) (rejecting argument that "irreparable harm" automatically follows from the "death of even a single member of an endangered species"). For example, in *Idaho Rivers*, the court rejected arguments that the death of individual lamprey, and the "take" of ESA-listed salmon equated to irreparable injury to the plaintiffs, finding instead that "courts require a showing that the identified harm to the species is 'significant vis-à-vis the overall population,' and not just that individual animals are likely to be injured." 156 F. Supp. 3d at 1262 (quoting *Pac. Coast Fed. of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 (E.D. Cal. 2008)). Likewise, the D.C. Circuit in *Fund for Animals v. Frizzell,* 530 F.2d 982, 986-87 (D.C. Cir. 1975), refused to grant an injunction for an agency action that would result in the death of "10,000 snow geese, or from 10 to 15 percent of the fall flight," because such harm was not irreparable absent "substantial possibility that the harvest of excessive numbers of these waterfowl will

irretrievably damage the species." In short, "[t]o equate the death of a small percentage of a reasonably abundant game species with irreparable injury without any attempt to show that the well-being of that species may be jeopardized is to ignore the plain meaning of the word." *Id*. Other courts agree.[8]

The potential impacts of the proposed surveys fall well below those in *Idaho Rivers* (actually killing lamprey and ESA-listed salmon) and *Frizzell* (killing 10,000 snow geese). NMFS estimates that there will be *no mortality or serious injury* associated with the surveys. The League can only speculate to the contrary. The minor and short-term disturbance of marine mammals is, at most, exceedingly *unlikely* to cause irreparable injury to the League's members' recreational and research interests. Indeed, the five IHAs *combined* identify only five species that even have the *potential* to experience minor injuries from a Level A harassment: the humpback whale (10), the minke whale (12), the fin whale (12), *Kogia* whale species (15), and the harbor porpoise (20). The League produces no evidence (and does not even argue) that these five species will suffer irreparable injury or that these *potential* injuries (calculated without considering mitigation) will result in harm "vis-à-vis the overall population" of any of the species. *Idaho Rivers*, 156 F. Supp. 3d  at 1262.

Furthermore, the League has not shown, and cannot show, that any of the Level B harassment authorized by the IHAs will result in species-level harm. With the exception of the right whale and the beaked whale (addressed separately below), the League does not even argue

___

[8] *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (ruling that irreparable harm "must be measured at the *species* level" in the context of an ESA challenge) (citing *NWF v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005)); *S. Utah Wilderness All. v. Thompson,* 811 F. Supp. 635, 642 (D. Utah 1993) ("[T]he coyote population [would] remain viable. . . .  This is not to say that the injuries [p]laintiffs assert are not real, but rather that this court finds that the injury is not irreparable.").

that Level B harassment of marine mammals can result in irreparable harm at a species level. The League has demonstrated no likelihood of serious injury or mortality to any marine mammal and no likelihood of species-level harm, and thus has provided no basis for injunctive relief.

### b. The League Fails to Demonstrate That Irreparable Harm to the North Atlantic Right Whale Is Likely.

The five IHAs authorize *zero* Level A harassments and a combined total of 19 Level B harassments of the North Atlantic right whale. The estimate of 19 Level B harassments is a conservative estimate that includes all *possible* disruptions, and does not take into account the benefits of certain mitigation measures. 83 Fed. Reg. at 63,336, 63,340. NMFS's BiOp concludes that any impact to the right whale will be minor and temporary, and that a few individual whales "may briefly respond to underwater sound by slightly changing their behavior or relocating a short distance." Steen Decl., Ex. J at 86. NMFS also concluded that the surveys were not likely to induce any severe physical or physiological response because those responses are "associated with explosives and/or mid-frequency tactical sonar, not seismic airguns," and that any stress response would be "short-term." *Id.* at 90. Moreover, NMFS included a large seasonal closure (at the request of one of the plaintiffs) prohibiting surveys from occurring within 90 kilometers of the coast from November through April, to protect the migratory corridor and nursing and calving grounds. 83 Fed. Reg. at 63,353. As a result, NMFS concluded that the surveys will "not affect the health of individual North Atlantic right whales" and will not "result in fitness consequences" to those whales. Steen Decl., Ex. J at 99; 83 Fed. Reg. at 63,352 (mitigation "may reasonably be expected to eliminate most potential for behavioral harassment of right whales.").

Resorting again to rhetoric, the League claims that these minor disturbances are an "existential threat" to the right whale. SCCCL Br. at 30. This position is not credible given the history of seismic and other geophysical surveys conducted without incident. *See* Gisiner Decl.

OPPOSITION TO SCCCL'S MOTION
FOR A PRELIMINARY INJUNCTION        - 18 -

¶¶ 63-66. For example, in 2017, NMFS issued an IHA for a survey (for siting a wind project) in the Atlantic Ocean that authorized *105 Level B* takes (more than five times the amount authorized for *all* surveys here) of right whales in 221 days of activity. 82 Fed. Reg. 32,330, 32,337 (July 13, 2017).[9] The League did not even comment on that IHA, let alone challenge it, and its failure to do so undermines the outlandish claims it makes here. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm").

The League relies on the opinions of experts (Dr. Kraus and Dr. Nowacek) who opine that future injury to individuals *and the entire species* is now likely to occur from seismic surveys. Despite the fact that NMFS addressed all of these concerns in response to public comments,[10] Dr. Kraus and Dr. Nowacek assert that the planned surveys will push the whale closer to extinction. But such opinions are insufficient in the absence of *evidence* of any past harm from seismic surveys and in the face of directly contrary opinions from NMFS—the agency entrusted by Congress to ensure the protection of marine mammals. *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) ("Despite NEDC's conflicting views regarding the potential for irreparable harm from in-stream gravel mining activities generally, the court must defer to 'the reasonable opinions of [the agency's] own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'") (quoting *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)).

In any event, Dr. Kraus' and Dr. Nowacek's opinions are undermined by their own

---

[9] This is not the only example of authorized Level B right whale harassments from seismic surveys in the Atlantic that have gone unchallenged by the League. *See, e.g.*, 83 Fed. Reg. 19,532, 19,541 (May 3, 2018) (authorizing 18 Level B right whale harassments).

[10] *See, e.g.,* 83 Fed. Reg. 63,276-78, 62,281-83.

history of obtaining research permits that authorize *hundreds* (if not more) of Level A takes and *tens of thousands* of Level B takes of right whales for more than a decade. For example, in 2016, Dr. Kraus accepted NMFS's conclusion that his request for a five-year permit for 50 Level A and 5,000 Level B takes *per year* would not appreciably reduce the likelihood of survival and recovery of the right whale. Steen Decl., Ex. G at 103. In 2010, Dr. Nowacek accepted the same expert conclusion by NMFS regarding his planned five-year annual take of 80 right whales by Level A harassment and 90 right whales by Level B harassment. *Id*., Ex. I at 26. Having agreed with NMFS that repeatedly subjecting the right whale to thousands of harassments for decades from research surveys (approaching sometimes as close as five meters by vessel, and on at least one occasion, actually striking a whale) and inflicting actual injuries with crossbows, they cannot credibly second-guess NMFS's reasoned conclusion that 19 Level B harassments will not jeopardize the right whale.

Nor should the Court be persuaded by Dr. Kraus' claim that "[d]espite almost 50 years of federal protections, the stock is now declining rapidly" and is "now in free-fall," as evidenced by recent morality events (caused by shipping and fish entanglements). Kraus Decl. ¶ 34. Dr. Kraus neglects to mention that seven new calves have been spotted this year. *See* Gisiner Decl. ¶ 80. Moreover, Dr. Kraus has been beating this same drum for decades. Twelve years ago, in his book *The Urban Whale*, Dr. Kraus warned that "despite being under protection for 70 years," populations remain low and are "declining in size," citing then-recent mortality events in which "at least nine right whales were killed by ships, and four have been killed by fishing gear entanglements." *See* Kraus and Rolland (eds.), *The Urban Whale*, at 3-4 (2007). When Dr. Kraus gave his warning in 2009, the population was "about 350 animals," having grown from the point in 1960 where the right whale was thought to be "extinct or very nearly so." *Id*. at 3-5. Twelve

years later, the population of North Atlantic right whales has grown to 411 animals, by Dr. Kraus' own estimate. Kraus Decl. ¶ 34. If there is a present decline at all, it is certainly not "rapid" and the population is not in "free-fall," and the recent mortality events are attributable to increased vessel strikes and fishing entanglements, not seismic surveys. *See* Gisiner Decl. ¶ 81.

Even setting aside these concerns, the opinions of Dr. Kraus and Dr. Nowacek are riddled with errors, incorrect assumptions, and mischaracterizations. *See* Giniser Decl. §§ III, IV, V. As just one example, Dr. Nowacek reaches the conclusion that right whales will suffer significant stress from seismic activities based on six papers, only one of which actually involved a mammal exposed to sound (a white lab rat subjected to noise from loudspeakers placed above its head). *See* Gisiner Decl. ¶ 78. In contrast, actual controlled studies of whales responding to seismic surveys show a minimal and short-term avoidance response. *Id*. ¶¶ 51-52.

All told, the League fundamentally fails to provide any credible evidence of irreparable harm to the right whale, and injunctive relief should therefore be denied.

          **c.**      **The League Fails to Demonstrate That Irreparable Harm to Beaked Whales Is Likely.**

The League's claims of irreparable harm to the beaked whale fail for essentially the same reasons. The IHAs authorize *zero* Level A harassment for beaked whales and Level B harassments ranging from 490 to 12,072 for each survey. 83 Fed. Reg. at 63,340. NMFS appropriately concluded that this small amount of authorized Level B harassment did not have the potential to injure beaked whales, but nonetheless included a suite of mitigation measures to further ensure reduced impacts to beaked whales, including three year-round closures of submarine canyon areas expected to provide important habitat for beaked whales, a seasonal closure of an area off of Cape Hatteras, and expanded shutdown requirements for beaked whales.

83 Fed. Reg. at 63,286. NMFS reasonably concluded that "the outcome is a negligible impact" on the beaked whale. *Id*. at 63,281.

Plaintiffs again rely on experts to contradict the agency's determination, this time, Dr. Andrew Read and Dr. Tyack, who are "concerned" about the number of authorized Level B harassments and the potential for repeated displacement (Tyack ¶ 8), stating (incorrectly) that "NMFS authorizes a total of 24,390 instances of harassment on a maximum population estimate of 25,284 beaked whales" (*id*. ¶ 22).[11] Again, these numbers must be viewed in context. The present authorization for the Navy's program in the Western North Atlantic is for more than 175,000 Level B harassments of beaked whales *per year*, which amounts to about 1,500% of the beaked whale population every year (or an average of 15 Level B harassments per whale, per year). *See* 83 Fed. Reg. 57,076, 57,243, Table 76 (Nov. 14, 2018). Yet despite these higher take levels for the Navy, there is no indication that the beaked whale population in the Atlantic is presently suffering irreparable injury as a result of these repeated Navy takes, and the League's beaked whale experts, Dr. Read and Dr. Tyack (who both do work for the Navy on these issues (*see* Read Decl. ¶ 9; Tyack Decl. ¶ 28)), unsurprisingly do not suggest otherwise.

Ultimately, the League's claims of irreparable harm to the beaked whale are built on a house of cards. The League's experts point to studies showing that beaked whales respond to *sonar*, which occurs at intense levels within the *mid-range* frequency where beaked whale hearing is most acute. Gisiner Decl. ¶¶ 27-32, 55, 83-91 (discussing the significant differences

---

[11] Dr. Tyack's asserted number of authorized takes is off by 1,066 beaked whales. Although Dr. Tyack asserts that he has reviewed the Federal Register notice for the IHAs and the IHAs themselves (Tyack Decl. ¶ 4), he appears to have overlooked footnote 8 to Table 15 (the table he cites) at 83 Fed. Reg. at 63,376, which explains the revisions to Spectrum's survey plan. Spectrum's actual authorized harassment is set forth in Spectrum's IHA. *See* Steen Decl., Ex. D at 18.

between seismic and sonar). Plaintiffs *concede* that "there have been no behavioral studies of the response of beaked whales to" seismic surveys, the sound of which occurs predominantly at *low frequencies*. Read Decl. ¶ 31. Nonetheless, the League's experts gloss over this disconnect and lack of scientific support, claiming that the lack of evidence "does not mean that beaked whales cannot detect or react adversely to such sounds." *Id*. But this double negative ("does not mean" they "cannot") is not a substitute for actual evidence that the beaked whale *will* react negatively to seismic surveys or a fact-based conclusion of what *level of reaction* is likely to occur. *See* Gisiner Decl. § IV.C. It is the League's burden to demonstrate that the irreparable injuries it predicts are *likely to occur* absent an injunction. It is not enough that "the sounds from seismic survey *cannot be ruled out* as posing a significant risk of serious injury or death to individual beaked whales." Tyack Decl. ¶ 10 (emphasis added). The League has not met that burden. *Winter*, 555 U.S. at 22; *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) ("[T]he *possibility* of irreparable harm does not constitute a 'clear showing' that the plaintiff is entitled to relief." (emphasis added)).

Without any scientific evidence of harm from seismic sound, the League's expert, Dr. Tyack, resorts to coincidence, pointing to two instances (one in Mexico and one in Spain) where seismic surveys occurred at the same time (or possibly at the same time) that two beaked whales were stranded some 45 to 50 kilometers away from where surveys occurred. Tyack Decl. ¶¶ 10, 16.  But, as explained by Dr. Gisiner, those coincident examples do not demonstrate causality. Gisiner Decl. ¶¶ 83-85. Here too, Dr. Tyack knows better than to insinuate a causal link between these stranding events and seismic activity. Although Dr. Tyack places the 2002 Mexico occurrence on his list of "mass stranded" events (Tyack Decl. ¶ 10) and insinuates a causal link with a seismic survey, in 2007 he told a court, when testifying on behalf of the Navy, that the

same 2002 event "does not represent an atypical stranding, or even a mass stranding by many definitions." Steen Decl., Ex. N ¶ 15. Dr. Tyack also previously testified that he agreed with other experts that the 2002 stranding could not be definitively attributed to the 2002 survey because of the "'lack of knowledge regarding the temporal and spatial correlations between the animals and the sound source,'" and he further opined that, even if the stranding was related, the survey in question used both seismic *and sonar*, and there would be no way to tell which sound source was to blame. *Id*. ¶¶ 15-16. Dr. Tyack's contradictory testimony here is not credible.

Tellingly, Dr. Tyack's present testimony, built on the spurious hypothesis that seismic will have the same effect as sonar, stops well short of claiming that irreparable injury is *likely*. He "suggests" that seismic will have the same effects as sonar (Tyack Decl. ¶ 26), states that population displacement "*could* interfere with beaked whales' ability to meet energetic requirements for survival" (¶ 29 (emphasis added)), that these "impacts *could* be compounded" (¶ 30 (emphasis added)) or "*could* compound" by multiple exposures (¶ 32 (emphasis added)). But the fact that something *could* happen does not mean that is *likely* to occur, and thus Dr. Tyack simply opines that harm is theoretically "possible," or "cannot be ruled out," which is legally deficient under *Winter*, 555 U.S. at 22. *See also Hodges*, 253 F. Supp. 2d at 864 ("A fear of speculative or remote future injury cannot constitute irreparable harm. There must be a likelihood that immediate irreparable harm will occur.") (citing *Manning*, 119 F.3d at 263).[12]

Furthermore, the opinions of the League's experts are based on inaccurate concerns about the extent of the surveys. For example, Dr. Tyack focusses specifically on WesternGeco's

---

[12] Nor is this the end of the flaws in the expert testimony of Dr. Read and Dr. Tyack. *See* Gisiner Decl. § VI.B (detailing numerous mischaracterizations and mistaken assumptions).

proposed survey, which will last 208 days (Tyack Decl. ¶ 30), and both experts rely on the

expectation that there will be five "overlapping" surveys. *Id.*; Read ¶ 40 ("all five surveys will

overlap in space and occur within the same general time period"). This is an exceedingly

unlikely scenario. WesternGeco has not completed its Coastal Zone Management Act process

and, accordingly, whether and when it might conduct a survey is entirely unknown. *See*

Declaration of Gary Stuart Poole. Additionally, at least three of the Exploration Companies are

coordinating their efforts such that only one survey will occur at any given time. *See*

Declarations of Peter Seidel, Michael Whitehead, and Richmond Miller. Accordingly, at most,

only two surveys may be operating at any given time within the enormous expanse of the U.S.

Atlantic OCS, further undermining the basis of Dr. Tyack's and Dr. Read's opinions.

      Finally, even if the League could demonstrate that some significant irreparable injury to

the beaked whale is likely (and it cannot), the League still fails to demonstrate that irreparable

harm to its *members* is likely. The League identifies a "research" interest and the "opportunity to

study beaked whales," claiming that "if whales abandon that area, even temporarily, it will

interfere with" their work. SCCCL Br. at 33-34. But neither the League nor its members explain

how (temporary) injury to research efforts is irreparable injury, or why they could not conduct

their research in areas off Cape Hatteras where seismic surveys were not occurring at a given

time. Courts have rejected similar efforts to manufacture irreparable injury based on research

interests. *CBD v. Hays*, No. 2:15-cv-01627-TLN, 2015 WL 5916739, at \*10 (E.D. Cal. Oct. 8,

2015) (The "declaration fails to describe a substantial and immediate irreparable injury because

[the declarant] fails to show that his research cannot be conducted in areas where logging will

not be implemented."); *In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125, 1138

(E.D. Cal. 2010) (rejecting claim of irreparable injury based on plaintiffs' claim "that

their ability to study free-roaming animals in their natural habitat, and within their particular family bands, will be impacted"). In summary, the League has failed to meet its heavy burden of demonstrating irreparable harm, and its motion should be denied for this reason alone.

**D.**     **The League's Motion Should Also Be Denied Because the League Is Unlikely to Succeed on the Merits.**

To succeed on the merits of its claims, the League must show that NMFS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The League is unlikely to prevail in demonstrating such errors because its arguments amount to nothing more than disagreement with NMFS's expert conclusions and ignorance of the plain content of the agency's record.

**1.**     **The League Is Unlikely to Prevail on Its MMPA Claims.**

The MMPA authorizes IHAs for "the incidental, but not intentional, taking by harassment of *small numbers* of marine mammals of a species or population stock," so long as the harassment "will have a *negligible impact* on such species or stock." 16 U.S.C. § 1371(a)(5)(D)(i) (emphases added). The League challenges both the "small numbers" and "negligible impact" determinations for the IHAs. Both challenges are unlikely to succeed.

***Small Numbers***. The League has challenged five *separate* IHAs, but fails to address whether *each* authorization supposedly violates the "small numbers" requirement. So, for example, ION's IHA authorizes no more than 2 percent harassment for any species. 83 Fed. Reg. at 63,376. The League does not argue that this authorized take is not a "small number" and therefore cannot be likely to succeed on a claim it has not made.

As to the other four IHAs, the League's "small number" arguments are equally misguided. The legislative history makes clear that Congress delegated broad discretion to NMFS's expertise, explaining that the "Committee recognizes the *imprecision of the term 'small numbers'*, but was unable to offer a more precise formulation because *the concept is not capable of being expressed in absolute numerical limits*." H.R. Rep. No. 97-228 at 19 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1458, 1469 (emphases added). The Ninth Circuit confirmed that discretion, explaining that (i) an agency "need not quantify the number of marine mammals that would be taken under the regulations, so long as the agency reasonably determines through some other means that the specified activity will result in take of only 'small numbers' of marine mammals" and (ii) the term means "small *relative to* the size of the mammals' larger population." *CBD v. Salazar*, 695 F.3d 893, 905-07 (9th Cir. 2012) (emphasis in original).

NMFS properly applied that broad discretion here. NMFS concluded that, given the nature of the seismic activity and its potential for minor but unavoidable or accidental impacts, that harassment of up to one-third of the species constituted "small numbers." 83 Fed. Reg. at 63,301. NMFS articulated that rationale in the record, grounded that rationale in the statutory language and legislative history, and expressly addressed and rejected in the record all the arguments now put forth here by the League. The League does not identify information that was overlooked or ignored, or argue that the "small numbers" finding "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. The League is therefore unlikely to prevail on this claim.

Furthermore, the League's arguments are undermined by NMFS's past practice with respect to "small numbers." There is nothing new or novel about NMFS's "small numbers" findings here. NMFS has repeatedly concluded that proportions similar to those present here, or

*much higher*, constitute "small numbers." *See, e.g.*, 82 Fed. Reg. 32,330, 32,343 (July 13, 2017)

(24% of the North Atlantic right whale population is a "small number"); 82 Fed. Reg. 17,209,

17,223 (Apr. 10, 2017) (52% of West Coast transient killer whales and 48% of Northern resident

killer whales); 81 Fed. Reg. 66,628, 66,637 (Sept. 28, 2016) (64% of bottlenose dolphin stock);

81 Fed. Reg. 40,852, 40,867 (June 23, 2016) (27% of West Coast transient killer whale

population and 25% of Northern resident killer whale population); 79 Fed. Reg. at 57,538 (27%

of sei whale population and 25% of pantropical spotted dolphin population); 79 Fed. Reg.

65,378, 65,384 (Nov. 4, 2014) (81% of bottlenose dolphin stock). Additionally, numerous

MMPA incidental take authorizations forego the quantified estimate entirely and perform a

purely qualitative "small numbers" analysis. *See, e.g.*, 71 Fed. Reg. 43,925 (Aug. 2, 2006); 73

Fed. Reg. 33,212 (June 11, 2008). NMFS's application of "small numbers" here is hardly

unreasonable in light of this past practice.[13]

       Without any support from the plain language of the statute, the legislative history, or

agency practice, the League resorts to the dictionary for a definition of "small" as "close to

zero." SCCCL Br. at 11. However, "small," for MMPA purposes, means small "*relative to* the

size of the mammals' larger population." *Salazar*, 695 F.3d at 905-07. "[C]lose to zero" is

plainly not a *relative* figure, and that definition is inapt. Moreover, other common definitions of

"small" better support NMFS's application, such as: "comparatively small in size" (Webster's),

"less in size or amount than is average" (Cambridge), "something smaller than the rest"

(American Heritage), "not large in size, amount, or number" (MacMillan), and "not great in

---

[13] The League relies heavily on *Evans*, 279 F. Supp. 2d 1129. However, that decision addressed highly impactful Navy sonar (not seismic surveys), involved NMFS's reliance on a regulatory definition found to be unlawful, and predated both *Salazar* and multiple non-sonar IHAs in which NMFS authorized higher proportions of incidental take.

amount, number, strength, or power" (Oxford).[14] The expansive range of definitions of the word "small" only emphasizes the ambiguity of the term "small numbers," which Congress entrusted NMFS to apply.[15]

***Negligible Impact.*** The League's "negligible impact" argument is also unlikely to succeed. Tellingly, the League offers *no argument* that any one of the five negligible impact determinations is erroneous. Nor does it argue that the five IHAs *combined* lead to a non-negligible impact. Instead, the League argues a procedural error—*i.e.*, that NMFS was supposed to add up all the negligible impacts together in a single document to see whether *five negligible findings = one non-negligible finding*. The fundamental flaw with this argument is that there is no statutory requirement under the MMPA to do this.

The MMPA states that the "negligible impact" finding is for "such harassment" resulting from "that activity"—*i.e.*, the "specified activity"—for which authorization is requested. *See* 16 U.S.C. § 1371(a)(5)(D)(i). NMFS's implementing regulations similarly require separate applications for each "specified activity" for which an IHA is sought and provide that "negligible

---

[14] *Webster's Third New International Dictionary* 2149 (2002); *Cambridge Dictionary,* https://dictionary.cambridge.org/us/dictionary/english/small (last visited Mar. 11, 2019); *American Heritage Dictionary* 1701 (3d ed. 1992); *MacMillan Dictionary,* https://www.macmillandictionary.com/us/dictionary/american/small_1 (last visited Mar. 11, 2019); *Oxford Dictionary*, https://en.oxforddictionaries.com/definition/small (last visited Mar. 11, 2019); *see also* 83 Fed. Reg. at 63,301.

[15] Without any basis to contradict the agency's reasoned conclusion, the League selectively resorts to analogies and alarmist scenarios in an effort to undermine NMFS's finding.  But the League's analogies are only as good as its definition of "small numbers," which NMFS explains are "cherry pick[ed]" from the definitions of "small" that suit its argument. 83 Fed. Reg. at 63,301. Other analogies support the opposite conclusion. For example, a reasonable person could conclude that a "small number" of voters turned out if only one-third of eligible voters cast ballots in an election. Likewise, the League's alarmist scenario that NMFS could or would authorize the "killing" of one-third of a species has never happened (despite harassment authorizations of more than one-third) and is little more than hyperbole.

impact" is "an impact resulting from the specified activity…." 50 C.F.R. § 216.103; *see generally* 50 C.F.R. §§ 216.101-216.108. As NMFS explained in the record, "[w]e believe the 'specified activity' for which incidental take coverage is being sought … is appropriately defined and described by the IHA applicant," and "[h]ere there are five specified activities, with a separate applicant for each," so, accordingly, "NMFS must make the necessary findings for each specified activity." 83 Fed. Reg. at 63,284. NMFS followed the statute and its own regulations, and the League is unlikely to succeed in proving otherwise.[16]

NMFS, of course, was required to (and did) evaluate the cumulative impacts of all the authorized harassments pursuant to NEPA, finding no significant impact. Steen Decl., Ex. K at 7 ("The proposed action considered herein is the issuance of the five IHAs, and the aggregate effects of such issuance on marine mammals"). Plaintiffs do not now challenge that NEPA finding, revealing that their negligible impacts claims are just make-weight. Having considered all relevant direct, indirect, and cumulative effects associated with all five IHAs, NMFS properly made its "negligible impact" determination for *each* IHA, as required by the MMPA and NMFS's implementing regulations. Nothing more was required and the League is therefore unlikely to succeed on the merits of this claim.

---

[16] The League mixes and matches the distinct requirements applicable to five-year incidental take regulations and one-year IHAs, respectively, by misleadingly citing to the preamble for a 1989 rulemaking applicable to five-year regulations (before the IHA provisions were even added to the MMPA). SCCCL Br. at 15. The MMPA permits NMFS to issue regulations applicable to many activities over a *five-year* period. *See* 16 U.S.C. § 1371(a)(5)(A)(i). For such regulations, the numerous activities covered by the regulations are collectively considered a "specified activity" for which NMFS must determine that the "total … taking" has a "negligible impact." *Id.* § 1371(a)(5)(A)(i)(I); *CBD v. Kempthorne*, 588 F.3d 701, 709-10 (9th Cir. 2009) (all activities under five-year regulation constitute a "specified activity").

2.    **The League Is Unlikely to Prevail on Its ESA Claims.**

*First*, the League claims that NMFS violated the ESA by failing to use the best available science when it applied an "outdated" 160 dB acoustic threshold to model the number of Level B harassments of ESA-listed whales. SCCCL Br. at 17-19. The League argues instead that NMFS should have used criteria discussed in a *proposed rule* for the Gulf of Mexico. This claim is unlikely to prevail under the APA's deferential standard because a court will "reject an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (internal quotation marks and citation omitted). The League does not even argue that this standard is met. Instead, the League argues that modeling using the 160 dB criterion is not based on the "best available science." SCCCL Br. at 18-19. That argument is equally doomed to failure as "[a]n agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta-Mendota*, 776 F.3d at 995.

Here, NMFS did not ignore the proposed Gulf of Mexico rule. Rather, NMFS acknowledged that it had "recently published proposed incidental take regulations for geophysical surveys in the Gulf of Mexico" and, after careful consideration and explanation, NMFS concluded "the current [160 dB] threshold allows for an appropriate, and often conservative, enumeration of predicted takes by Level B harassment, which support robust negligible impact and small numbers analyses." 83 Fed. Reg. at 63,286. NMFS also considered all scientific models upon which the criteria preferred by the League are based and ignored nothing. *Id.* at 63,284-86. NMFS's conclusion as to "what constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference" and the

League is unlikely to prevail on this claim. *San Luis & Delta-Mendota*, 776 F.3d at 995 (citation omitted).[17]

**Second**, the League argues that NMFS violated the ESA's "best available science" requirement by failing to consider (i) the "risk" of "overlapping" surveying and (ii) the effects of "other present and future noise-generating activities." SCCCL Br. at 20-21. These arguments are not likely to succeed either because they are factually wrong. NMFS *did* consider these factors in the BiOp. As the BiOp explains, NMFS considered all five "IHAs together given the similarity and timing of the actions," and rationally concluded that there would be no "synergistic impacts between and among the permits and IHAs given the time and location across a broad geographic area in the mid- and South Atlantic." Steen Decl., Ex. J at 17-18. NMFS considered the action under consultation "to encompass the issuance of *all five permits and IHAs, and thus, evaluate[d] their combined effects as a whole.*" *Id*. at 8-9 (emphasis added); *see id.*, Ex. A at 71.

NMFS also considered other present and future noise-generating activities in Section 8 of the BiOp (the environmental baseline), which includes "the past and present impacts of all Federal, state, or private actions and other human activities in the action area." *Id.*, Ex. J at 22. NMFS comprehensively evaluated that baseline, including assessment of the effects of Navy sonar that the League incorrectly claims NMFS ignored, along with the past and present effects of climate change, ocean temperature regimes, disease, invasive species, pollution, marine

---

[17] The League's argument that the agency "abandoned" or "rejected" modeling based on the 160 dB threshold is not accurate. A proposed rule, obviously, has no binding effect (*Sweet v. Sheahan*, 235 F.3d 80, 88 (2d Cir. 2000)), and, since that proposal, the agency has continued to use modeling based on 160 dB. *See* 84 Fed. Reg. 7,023 (Mar. 1, 2019) (IHA issued by NMFS using 160 dB acoustic threshold for Level B harassment associated with impact pile driving); 83 Fed. Reg. 39,692 (Aug. 10, 2018) (IHA issued by NMFS using 160 dB acoustic threshold for Level B harassment associated with seismic survey conducted by USGS).

debris, pesticides and contaminants, oil spills, fisheries, bycatch, aquaculture, whaling, sea turtle harvest, scientific research, vessel strikes, sound, seismic surveys, and military exercise. *Id*., Ex. J at 22-24. Next, NMFS added the effects of the action to those baseline effects and any cumulative effects. *Id*., Ex. J at 44-108. Then, NMFS correctly performed an analysis of the Section 7 jeopardy standard based upon all these added effects. *See id*., Ex. J at 107-12 ("In this section, we add the *Effects of the Action* (Section 9) to the *Environmental Baseline* (Section 8) and the *Cumulative Effects* (Section 10) to formulate the agency's opinion as to whether the proposed action is likely to" reach the jeopardy threshold). NMFS plainly did not "conduct its jeopardy analysis in a vacuum," as the League contends, and this claim is unlikely to prevail.

**Third**, the League objects to a condition in the IHAs that allows a permittee to develop and submit for review and approval an alternative mitigation and monitoring plan that would allow reducing the seasonal closure for the North Atlantic right whale to 47 km offshore *if* the plan achieves "comparable protection." SCCCL Br. at 23-25. But this claim is not ripe. No party has submitted an alternative mitigation plan, and even if one is later submitted, NMFS may not ever approve it. Moreover, the BiOp explains that if such an application is received by NMFS's Permits and Conservation Division (the division that approves IHAs), that division would need to "engage" the Endangered Species Act Interagency Cooperation Division "for evaluation of the plan to ensure it is within the scope of the analyses in [the BiOp]." Steen Decl. Ex. J at 20-21. What may or may not result from an internal re-engagement of the consultation division, if one ever is needed, is presently unknown. *See Texas v. United States*, 523 U.S. at 300 ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation and internal quotation marks omitted)). Moreover, even if the condition were entirely improper (it is not), that is, at most, grounds for

invalidating the condition, not the entire BiOp or the IHAs. *Zepeda v. INS*, 753 F.2d 719, 729 n.1 (9th Cir. 1983) ("injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs, 'rather than to "enjoin all possible breaches of the law"'" (citation omitted)).

### 3.      The League Is Unlikely to Prevail on Its NEPA Claims.

The League is also unlikely to prevail on its argument that NMFS was required to produce an EIS under NEPA because, in 2014, BOEM *already* produced a comprehensive PEIS that evaluated the impacts of all potential seismic surveys (and other surveys) that were reasonably foreseeable in the Atlantic through 2020. Steen Decl., Ex L. NMFS was a "cooperating agency for the development of that Programmatic EIS," and the EIS was intended to "serve" NMFS "as an assessment of potential impacts to marine resources." *Id.*, Ex. L at 17, 22. The PEIS evaluated a much broader range of potential surveys than authorized here, and explains, "[t]he impacts of future site-specific actions will be addressed in subsequent NEPA evaluations, per CEQ regulations (40 CFR §1502.20), by tiering from this programmatic evaluation." *Id.*, Ex. L at 18. That is precisely what happened here. NMFS issued a Record of Decision adopting the PEIS on February 23, 2018 (*id.*, Ex. O (Record of Decision)), and proceeded to develop and adopt, in November 2018, an EA that "tiered" to the PEIS, "incorporate[d] the relevant portions" of the PEIS, and considered *new information since completion* of the EIS (*id.*, Ex. A at 7; 83 Fed. Reg. at 63,315).

Even ignoring the existence of the EIS, the League's arguments that another EIS is required in order to address factors such as "unknown risks" is unpersuasive given the 80-year history of seismic surveys and the absence of any documented associated harm.[18] The League

---

[18] Many courts have affirmed the use of an EA for MMPA incidental take authorizations. *See Native Vill. of Point Hope v. Minerals Mgmt. Serv.*, 564 F. Supp. 2d 1077, 1083-84 (D. Alaska

(continued . . .)

also identifies four significance factors from 40 C.F.R. § 1508.27, but NMFS's Finding of No Significant Impact explains why each of those factors does not warrant an EIS, and the League does not address those findings or argue that they are arbitrary and capricious. Steen Decl., Ex. K at 4-9. The League is therefore unlikely to prevail on its NEPA claim.

**E.    The Balance of the Equities and Public Interest Weigh Against an Injunction.**

In the OCSLA, Congress expressly directs BOEM to ensure the "expeditious and orderly development" of the OCS. 43 U.S.C. § 1332(3). Applying the traditional balancing of equities test, the U.S. Supreme Court has held that the balance of hardships does not favor an injunction where environmental injury is not a probable result of oil and gas leasing and exploration, and yet delay will both contravene the purposes of the OCSLA and cause the loss of millions of dollars. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). For the reasons stated above, that is the case here. The five surveys authorized here "present no risk of irreparable harm to *any* marine species" (Gisiner Decl. ¶ 12) and will delay the gathering of information that is essential to the long-term energy needs of the United States.

## IV.  CONCLUSION

For the foregoing reasons, the League's motion should be denied in whole. Alternatively, if the Court is inclined to grant any of the relief requested, basic principles of equity require the court to tailor the injunction to be "no more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The League has made no effort to tailor its request, and, therefore, Intervenor-Defendants respectfully request briefing on the scope of a remedy if the Court is inclined to grant any relief on this motion.

---

(. . . continued)
2008); *Kempthorne*, 588 F.3d at 711-12; *Alaska Wilderness League v. Jewell*, 116 F. Supp. 3d 958, 970-71 (D. Alaska 2015).

DATED:  March 13, 2019                    Respectfully submitted,


                                         s/ Sean D. Houseal
                                         Richard Morton, Fed. Id. No. 5442
                                         Sean Houseal, Fed. Id. No. 7676
                                         WOMBLE BOND DICKINSON (US) LLP
                                         301 S. College Street, Suite 3500
                                         Charlotte, NC 28202-6037
                                         5 Exchange Street
                                         Charleston, SC  29401
                                         Telephone:  704-331-4993
                                                      843-720-4622
                                         Facsimile:  843-723-7398
                                         Email:  Ric.Morton@wbd-us.com
                                         Email: Sean.Houseal@wbd-us.com


                                         Ryan P. Steen, Admitted *Pro Hac Vice*
                                         Jason T. Morgan, Admitted *Pro Hac Vice*
                                         STOEL RIVES LLP
                                         600 University Street, Suite 3600
                                         Seattle, WA  98101
                                         Telephone: 206-624-0900
                                         Facsimile: 206-386-7500
                                         Email: ryan.steen@stoel.com
                                                 jason.morgan@stoel.com

                                         *Counsel for Intervenor-Defendants*