UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, et al., | ) ) ) | Civ. No. 2:18-cv-3326-RMG |
| Plaintiffs, | ) ) ) | (Consolidated with 2:18-cv-3327-RMG) |
| v. | ) ) ) | **FEDERAL DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFF-INTERVENOR SOUTH CAROLINA'S COMPLAINT-IN-INTERVENTION** |
| WILBUR ROSS, in his official capacity as the Secretary of Commerce, et al., | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATUTORY BACKGROUND ................................................................................. 1

        A.      OCSLA ............................................................................................................ 2

        B.      Executive Order 13,795 ................................................................................. 3

        C.      Factual Background ........................................................................................ 3

III.    STANDARD OF REVIEW ......................................................................................... 5

IV.     ARGUMENT ............................................................................................................... 6

        A.      The State Lacks Article III Standing to Challenge the Order Because the
                State's Alleged Harm Cannot Be Redressed By the Relief It Seeks. ..................... 6

        B.      The Complaint's Allegations that the Executive Order Is Invalid Do Not
                Withstand Scrutiny ........................................................................................ 8

                1.      The Complaint's OCSLA Claims Must Be Dismissed ............................ 8

                2.      There was no wholesale withdrawal of the Atlantic OCS from
                        leasing. .................................................................................................. 10

                3.      A withdrawal does not preclude survey activities. ................................ 12

        C.      The State's Public Nuisance And Trespass Claims Should Be Dismissed .......... 13

                1.      The United States has not waived its sovereign immunity with
                        respect to the State's tort claim. ........................................................... 13

                2.      There is no cognizable federal common law public nuisance or
                        trespass claim against NMFS ................................................................ 17

                3.      Congress has displaced federal common law. ....................................... 19

                4.      The State's public nuisance and trespass claims fail to state claims
                        on which relief can be granted. ............................................................. 21

                        a.      Public nuisance. .......................................................................... 22

                        b.      Trespass ...................................................................................... 24

        D.      The Complaint Fails to Plead a Legally Cognizable Admiralty Claim. ............... 25

1.   The Complaint's Recitation of the State's Admiralty Claim Fails to Satisfy Rule 8(a). ..................................................................... 26

2.   The Complaint Fails To Plead An Admiralty Claim. .............................. 27

a.   No tort on navigable waters is alleged. .......................................... 27

b.   No maritime nexus is alleged. ....................................................... 28

V.   CONCLUSION ............................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
   468 U.S. 737 (1984)................................................................................................ 7

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011)......................................................................................... 19, 20

*Anheuser-Busch, Inc. v. Schmoke*,
   63 F.3d 1305 (4th Cir. 1995) ................................................................................. 3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................... 5, 9, 27

*Babb v. Lee County Landfill SC, LLC*,
   747 S.E. 2d 468  (2013) ....................................................................................... 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)............................................................................ 5, 6, 9, 15, 27

*Blagojevich v. Gates*,
   519 F.3d 370 (7th Cir. 2008) .............................................................................. 16

*Briggs v. Newberry Cty. Sch. Dist.*,
   838 F. Supp. 232 (D.S.C. 1992)............................................................................ 3

*City of Fredericksburg v. Fed. Energy Regulatory Comm.*,
   876 F.2d 1109 (4th Cir. 1989) ............................................................................ 12

*City of Milwaukee v. Illinois & Michigan*,
   451 U.S. 304 (1981)................................................................................. 17, 18, 19

*Coll. of Charleston Found. v. Ham*,
   585 F. Supp. 2d 737 (D.S.C. 2008)..................................................................... 24

*Ctr. for Sustainable Econ. v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015)............................................................................... 2

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)............................................................................................... 7

*E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*,
   213 F.3d 175 (4th Cir. 2000) ................................................................................ 5

*E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .............................................................................. 11

*Exec. Jet Aviation, Inc. v. City of Cleveland*,
   409 U.S. 249 (1972)....................................................................................... 28, 29

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994)....................................................................................... 13, 15

*Foster v. Peddicord,*
  826 F.2d 1370 (4th Cir. 1987) ........................................................................... 29

*Francis v. Giacomelli,*
  588 F.3d 186 (4th Cir. 2009) ............................................................................... 9

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................................... 10

*GE Inv. Private Placement Partners II v. Parker,*
  247 F.3d 543 (4th Cir. 2001) ............................................................................... 5

*Greenberg Inv. P'hip, L.P. v. Cary's Lake Homeowners' Ass'n,*
  No. 3:15-cv-05096-JMC, 2016 WL 2766675 n.5 (D.S.C. May 13, 2016) .............. 22

*Hawkins v. City of Greenville,*
  594 S.E. 2d 557 (S.C. Ct. App. 2004) .................................................................. 24

*Hedgepath v. Am. Tel. & Tel. Co.,*
  559 S.E. 2d 327 (S.C. Ct. App. 2001) .................................................................. 24

*Higgins v. Leland,*
  839 F. Supp. 374 (D.S.C. 1993) .......................................................................... 27

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir.2007) ................................................................................... 10

*In re Madison Coal & Supply Co.,*
  321 F. Supp. 2d 809 (S.D. W. Va. 2003) ............................................................. 28

*In re MI Windows & Doors, Inc. Prods. Liab. Litig.,*
  No. 2:12-CV-01297-DCN, 2012 WL 5384922 (D.S.C. Nov. 1, 2012) ...................... 6

*J.W. Hampton, Jr. & Co. v. United States,*
  276 U.S. 394 (1928) ........................................................................................... 12

*Jerome B. Grubart, Inc. v. Great Lakes Dredge and Dock Co.,*
  513 U.S. 527 (1995) ..................................................................................... 26, 28

*Kerns v. United States,*
  585 F.3d 187 (4th Cir. 2009) ............................................................................... 5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................. 6

*Mack v. Edens,*
  464 S.E. 2d 124 (1995) ....................................................................................... 24

*Michigan v. U.S. Army Corps of Eng'rs,*
  667 F.3d 765 (7th Cir. 2011) ................................................................... 15, 16, 21

*Michigan v. U.S. Army Corps of Eng'rs,*
  758 F.3d 892 (7th Cir. 2014) ........................................................... 18, 19, 20, 23

*Middlesex Cty Sewerage Auth. v. Nat. Sea Clammers Ass'n,*
    453 U.S. 1 (1981) ............................................................................................................ 19

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ........................................................................................ 10

*Mistretta v. United States,*
    488 U.S. 361 (1989) ...................................................................................................... 12

*Mobil Oil Corp. v. Higginbotham,*
    436 U.S. 618 (1978) ...................................................................................................... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................................ 13

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002) ................................................................................... 12

*Navajo Nation v. U.S. Dep't of Interior,*
    876 F.3d 1144 (9th Cir. 2017) ...................................................................................... 16

*New England Legal Found. v. Costle,*
    666 F.2d 30 (2d Cir. 1981) ........................................................................................... 22

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) .............................................................................. 11

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) ........................................................................... 22, 23, 24

*Papasan v. Allain,*
    478 U.S. 265 (1986) ........................................................................................................ 6

*Pryor v. Am. President Lines,*
    520 F.2d 974 (4th Cir .1975) ........................................................................................ 28

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States,*
    945 F.2d 765 (4th Cir. 1991) .......................................................................................... 5

*Robinson v. City of Columbia,*
    No. 3:15-1398-CMC-PJG, 2015 WL 7769233 (D.S.C. Nov. 5, 2015) ................................... 10

*Sabin v. Berglund,*
    585 F.2d 955 (10th Cir. 1978) ...................................................................................... 12

*Sisson v. Riby,*
    497 U.S. 358 (1990) ...................................................................................................... 26

*State v. Turner,*
    18 S.E.2d 372 (S.C. 1942) ............................................................................................ 22

*Talbert v. United States,*
    932 F.2d 1064 (4th Cir. 1991) ...................................................................................... 14

*Tulare Cty. v. Bush*,
 306 F.3d 1138 (D.C. Cir. 2002) ............................................................. 12

*United States v. Burns*,
 418 F. App'x 209 (4th Cir. 2011) ........................................................... 12

*Wheeldin v. Wheeler*,
 373 U.S. 647 (1963) ............................................................................... 17

*White Tail Park, Inc. v. Stroube*,
 413 F.3d 451 (4th Cir. 2005) ................................................................... 5

*White v. United States*,
 53 F.3d 43 (4th Cir. 1995) ............................................................... 26, 28

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990) ................................................................................. 6

*Whittington v. Sewer Construction Co., Inc.*,
 541 F.2d 427 (4th Cir. 1976) ................................................................. 28

*Williams v. U.S.*,
 242 F.3d 169 (4th Cir. 2001) ................................................................. 15

*Winley v. Int'l Paper Co.*,
 No. 2:09-2030-CWH, 2012 WL 13047989 (D.S.C. Oct. 23, 2012) ......... 22

**Constitutional Provisions**

U.S. CONST. art. I, § 1 .............................................................................. 11

U.S. CONST. art. IV, § 3 ............................................................................ 2

**Statutes**

5 U.S.C § 706(2) ...................................................................................... 16

5 U.S.C. § 702 ............................................................................... 14, 15, 16

5 U.S.C. § 702(2) ..................................................................................... 17

16 U.S.C. § 1362(12)(A) .......................................................................... 21

16 U.S.C. § 1371(a)(5)(A)(i) .............................................................. 18, 21

16 U.S.C. § 1532(15) ............................................................................... 21

16 U.S.C. § 1536(a)(2) ............................................................................. 21

16 U.S.C. §§ 1361-1423h ........................................................................... 2

28 U.S.C. § 1333 ...................................................................................... 26

28 U.S.C. § 1346(b)(1) ....................................................................... 14, 15

28 U.S.C. § 2674 ...................................................................................... 14

42 U.S.C. § 4332(2)(C) ............................................................................................ 21

42 U.S.C. §§ 4321-4370m-12 ..................................................................................... 2

43 U.S.C. § 1301 ...................................................................................................... 24

43 U.S.C. § 1301(a)(2) ....................................................................................... 23, 25

43 U.S.C. § 1302 ...................................................................................................... 23

43 U.S.C. § 1337 ...................................................................................................... 13

43 U.S.C. § 1337 (a) .................................................................................................. 2

43 U.S.C. § 1337(p)(1)(c) .......................................................................................... 4

43 U.S.C. § 1340 ................................................................................................. 2, 13

43 U.S.C. § 1341(a) .................................................................................................. 10

43 U.S.C. § 1344 ........................................................................................................ 2

43 U.S.C. § 1351 ........................................................................................................ 2

43 U.S.C. §§ 1340 .............................................................................................. 2, 12

Consol. Sec., Disaster Assistance, & Continuing Appropriations Act 2009,
    Pub. L. No. 110–329, 122 Stat. 3574 (2008) ....................................................... 4

Dep't of the Interior & Related Agencies Appropriations Act 1998,
    Pub. L. No. 105–83, 111 Stat. 1543 (1997) ......................................................... 4

Gulf of Mexico Energy Security Act of 2006,
    Pub. L. No. 109-432, 120 Stat. 3000 (2006) ........................................................ 7

Omnibus Appropriations Act, 2009,
    Pub. L. No. 111-8, 123 Stat. 524 (2009) .............................................................. 4

**Regulations**

30 C.F.R. § 550 ........................................................................................................ 10

30 C.F.R. § 551 ................................................................................................... 4, 10

30 C.F.R. pt. 551 ...................................................................................................... 12

40 C.F.R. § 1508.13 ................................................................................................. 21

82 Fed. Reg. 20,815 (Apr. 28, 2017) ......................................................................... 3

83 Fed. Reg. 63,268 (Dec. 7, 2018) ........................................................... 3, 18, 23, 25

**Other Authorities**

Executive Order 13,795 ........................................................................................ 3, 11

H.R. Rep. No. 101-120 (1989) .................................................................................... 3

Memorandum for the Secretary of the Interior 06/12/98,
  1998 WL 314420 (June 12, 1998) ................................................................................. 4

Memorandum for the Secretary of the Interior,
  2008 WL 2722978 (July 14, 2008) .............................................................................. 4

Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental
  Shelf from Mineral Leasing,
  2016 Daily Comp. Pres. Doc. 861 (Dec. 20, 2016) .................................................... 11

Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990) ........... 4

RESTATEMENT (SECOND) OF TORTS § 821B (Am. Law. Inst. 1979) ........................... 13, 22, 23, 25

Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW, ch. 3 (Prac. ed.1 987).................... 27

**LIST OF ACRONYMS**

| | |
|---|---|
| BOEM | Bureau of Ocean Energy Management |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| G&G | Geological and Geophysical |
| IHA | Incidental Harassment Authorization |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| PEIS | Programmatic Environmental Impact Statement |

## I.     INTRODUCTION

The State of South Carolina's Complaint-in-Intervention ("Complaint"), ECF No. 126, states four novel and legally baseless theories raised by no other party to this suit.  First, that a 2017 Executive Order and Secretarial Order of the Department of the Interior are invalid because they retract putative policies from the previous Administration.  Second, that the proposed survey activity at issue in the case constitutes a public nuisance.  Third, that any proposed survey activities constitute trespass.  And fourth, that the proposed survey activities violate admiralty law.  These legal theories have no merit and are divorced from the only challenged agency action:  the National Marine Fisheries Service's ("NMFS") Incidental Harassment Authorizations ("IHAs") associated with five applications to conduct seismic surveys in the Atlantic Outer Continental Shelf ("OCS").

As a threshold matter, the State lacks standing to challenge Executive Order 13,795 (the "Order").  Further, the State is also wrong when it asserts that the Orders are invalid, or in violation of the Outer Continental Shelf Lands Act ("OCSLA"), because they are tantamount to illegal attempts to reverse previous withdrawals of the Atlantic OCS from leasing.  There was no wholesale withdrawal of the Atlantic OCS from disposition of leasing in 2016, and even if there were such a withdrawal, it would not preclude the proposed seismic survey activity at issue.  Further, the State's claim that the proposed surveys give rise to claims for public nuisance and trespass is barred by the doctrine of sovereign immunity, is displaced by other statutes, and is otherwise legally untenable.  Finally, the Complaint fails to plead a legally cognizable admiralty claim.

## II.     STATUTORY BACKGROUND

The statutory background below is provided because the Complaint includes two causes of action involving OCSLA. Compl. ¶¶ 23-26, 45-46.  However, there is not final agency decision

pursuant to OCSLA before this Court, rendering any OCSLA claim legally irrelevant. The only challenged final agency action before this Court is NMFS's issuance of the IHAs pursuant to its authority under Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h.

### A.     OCSLA

Congress has authority over the disposition of the mineral resources of the OCS – that vast area extending from the end of the State's jurisdiction (generally three miles) to 200 nautical miles seaward of the United States' shoreline. U.S. CONST. art. IV, § 3, cl. 2; *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015). Congress exercised authority in the OCS by passing OCSLA in August 1953. As amended, OCSLA sets forth a four-step detailed procedure for developing offshore minerals. This procedure begins with the approval of a five-year oil and gas leasing program under which the Secretary of Interior proposes a schedule of and the general size and location of potential oil and gas lease sales. *See* 43 U.S.C. § 1344. The decision to hold an individual oil and gas OCS lease sale comes after several processes under OCSLA, the National Environmental Policy Act ("NEPA"), and other applicable laws and their implementing regulations have taken place. *See id.* § 1337(a); 42 U.S.C. §§ 4321-4370m-12. Lessees thereafter submit exploration plans; and, upon discovery of commercial quantities of minerals, they submit development plans. OCSLA and the Coastal Zone Management Act provide certain rights of review of these plans by state and local governments, and the plans must be approved by BOEM ("Bureau of Energy Management") for exploration and development to occur. *See* 43 U.S.C. §§ 1340, 1351; *Ctr. for Sustainable Econ.*, 779 F.3d at 594.

Seismic surveys are authorized by BOEM under a section of OCSLA separate from the leasing provisions. See 43 U.S.C. § 1340. Congress has previously stated that issuance of geological and geophysical survey permits are separate decisions not considered part of the

OCSLA pre-leasing steps.  See H.R. Rep. No. 101-120, "Department of the Interior and Related Agencies Appropriation Bill, 1990" pp. 41-42 (June 28, 1989).

### B.     Executive Order 13,795

The Executive Order Implementing an America-First Offshore Energy Strategy announced the policy of the United States to encourage energy exploration and production on the Outer Continental Shelf, in order to maintain the Nation's position as a global energy leader and foster energy security and resilience for the benefit of the American people, while ensuring that any such activity is safe and environmentally responsible.  Exec. Order No. 13,795 § 2, 82 Fed. Reg. 20,815 (Apr. 28, 2017).  To implement this policy, the President took three categories of action: (1) modified previous actions by the then President to withdraw certain areas of the OCS from oil and gas development (*id.* § 5); (2) directed the Secretary of the Interior to reconsider certain regulations and policies (*id.* §§ 3, 6, 7, 8, 9, 11); and (3) directed the Secretary of Commerce to reconsider certain Marine Sanctuaries, regulations, and agency guidance (*id.* §§ 4, 9, 10).

### C.     Factual Background

The five IHAs that are the subject of this litigation are for proposed surveys on the Outer Continental Shelf, far offshore and well outside of state waters.  Compl.¶ 1 (ECF No. 1). NMFS issued the five IHAs on November 30, 2018, and published a notice of its final decision on December 7, 2018. Takes on Marine Mammals Incidental to Specified Activities, 83 Fed. Reg. 63,268, 63,381.[1] The IHAs were issued after concluding formal consultation under Section 7 of

---

[1] Federal Defendants cite certain publically available materials of which the Court may take judicial notice to provide context for the State's claims.  *See e.g., Briggs v. Newberry Cty. Sch. Dist.*, 838 F. Supp. 232, 233-34 (D.S.C. 1992) (on a motion to dismiss, court may consider judicially noticeable materials); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), (court may consider legislative history in adjudicating Rule 12(b)(6) motion), *cert. granted, judgment vacated*, 517 U.S. 1206, (1996), and *opinion adopted in part*, 101 F.3d 325

the Endangered Species Act ("ESA"), which resulted in a Biological Opinion ("BiOp") that concluded the surveys and associated IHAs were not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat.  The IHAs also included an Incidental Take Statement.  NMFS transmitted the BiOp to BOEM on November 28, 2018. AR2184-2190. On November 29, 2018, NMFS completed an Environmental Assessment ("EA") that tiered off BOEM's Programmatic EIS ("PEIS") for G&G Activities in the Mid and South Atlantic (AR4901), and signed a Finding of No Significant Impact ("FONSI"). AR7192.

The authority to issue permits for seismic surveys rests with BOEM under the OCSLA, 43 U.S.C. § 1337(p)(1)(c)); 30 C.F.R. § 551 *et seq*.  In this case, BOEM has yet to make a final decision on the permit applications and survey activities cannot commence unless the permits are granted. The authorization of geological and geophysical ("G&G") permits, including for seismic surveys, by BOEM is a separate decision process from whether to offer oil and gas lease sales in the Atlantic.  BOEM has yet to authorize leasing in the Atlantic since 2008, when the Congressional moratoria expired[2] and a Presidential withdrawal preventing leasing in the Atlantic was modified.  AR4963.[3]

---

(4th Cir. 1996); Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357 (1990) (courts may consider matters of public record in deciding Rule 12(b)(6) motions).

[2] *Compare* Sections 108-111, Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–83, 111 Stat. 1543, 1561-62 (1997), *with* Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110–329, 122 Stat 3574, 3576 (2008); Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 723 (2009).

[3] Memorandum for the Secretary of the Interior, 2008 WL 2722978 (July 14, 2008); Memorandum for the Secretary of the Interior 06/12/98, 1998 WL 314420 (June 12, 1998).

### III.     STANDARD OF REVIEW

In a motion under 12(b)(1) for lack of subject matter jurisdiction, a court should consider the facts in the complaint to be true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts standing as the basis for the motion to dismiss, "the district court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 570 (2007) ("*Twombly*").  A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" — a standard that requires more than facts "that are 'merely consistent with' a defendant's liability . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 557).

Indeed, the complaint must "permit the court to infer more than the mere possibility of misconduct. . . ." *Iqbal*, 556 U.S. at 679. Although all well-pled allegations are presumed to be true and are viewed in the light most favorable to the plaintiff, *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Similarly, a court need not accept as true a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D.*

*Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), or "a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## IV.    ARGUMENT

The State lacks standing to challenge Executive Order 13,795 because there is a fundamental redressability problem.  No relief the Court might grant in connection with the Order would affect NMFS's IHAs.    In addition, the Complaint incorrectly alleges that the Order is invalid, or in violation of OCSLA because it is tantamount to an illegal attempt to reverse previous withdrawals of the Atlantic OCS from leasing. There was no wholesale withdrawal of the Atlantic OCS from leasing in 2017, and even if there were such a withdrawal, it would not preclude the proposed seismic survey activity.  Moreover, the State's public nuisance and trespass claims are barred by the doctrine of sovereign immunity, are not cognizable claims, and are displaced by other statutes.  Finally, the State's admiralty clam is not legally cognizable because it fails to satisfy Rule 8(a) and the requirements for invoking admiralty jurisdiction.

### A.  The State Lacks Article III Standing to Challenge the Order Because the State's Alleged Harm Cannot Be Redressed By the Relief It Seeks.

The State lacks standing to challenge Executive Order 13,795 because an order declaring the Order invalid would not likewise render the IHAs invalid.  The State bears the burden of establishing facts sufficient to satisfy the three minimum requirements of standing and cannot simply rely on allegations.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The requirement for standing is not a mere formality — it is a constitutional requirement to ensure that the Court is deciding a true case or controversy, that is, a dispute that is "appropriately resolved through the judicial process[.]" *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  Moreover, "[s]tanding must be considered as it pertains to each cause of action . . . ." *In*

6

*re MI Windows & Doors, Inc. Prods. Liab. Litig.*, No. 2:12-CV-01297-DCN, 2012 WL 5384922, at *2 (D.S.C. Nov. 1, 2012). That is, a party "must demonstrate standing for each claim he seeks to press" *and* "for each form of relief sought[.]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citations omitted); *see Allen v. Wright*, 468 U.S. 737, 752 (1984) ("Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Here, the State lacks standing to challenge Executive Order 13,795 because it has not demonstrated that the Order plausibly poses a harm that can be redressed by the relief it seeks. While ostensibly seeking to enjoin the effectiveness of the IHAs, the State challenges the President's authority to modify prior alleged withdrawals under OCSLA. But enjoining the implementation of Executive Order 13,795 would not redress the harm that the State cites to support its claim of standing – NMFS's IHAs do not in any way depend on the Order. Moreover, even without the Executive Order, the Department of the Interior can and does permit geological and geophysical surveys on lands that have been withdrawn under OCSLA Section 12(a), subject to the requirements of OCSLA, the ESA, and the MMPA.

To the extent the State seeks to obfuscate this causal break by arguing that Executive Order 13,795 promotes activities related to oil and gas exploration — including surveys — that too is incorrect. Geological and geophysical surveys are conducted even where there is no opportunity to lease in the study area. For example, Section 104 of the Gulf of Mexico Energy Security Act of 2006 ("GOMESA"), Pub. L. No. 109-432, 120 Stat. 3000, 3003, prohibited the Department of the Interior from offering for oil and gas leasing any areas east of the Military Mission Line in the

Eastern Planning Area of the Gulf of Mexico until June 30, 2022. Since GOMESA's enactment, the Bureau of Ocean Energy Management has issued thirty-four permits to entities interested in conducting geological or geophysical activities for the exploration of minerals in this area. Twenty-six of the thirty-four permits were issued for the acquisition of information regarding oil and gas resources, and all but one of these permits were issued before the issuance of Executive Order No. 13,795. And the pending permit applications for surveys in the Atlantic here were submitted without Atlantic sales being authorized in any five year program. In other words, the proposed seismic surveys are legally distinct from the Order.

The harm that the State asserts – potential damage from the IHAs and proposed geological and geophysical surveys – is not caused by Executive Order 13,795 and will not be redressed even if this Court were to find that the Order is invalid. Accordingly, the State has failed to establish standing.

**B. The Complaint's Allegations that the Executive Order Is Invalid Do Not Withstand Scrutiny.**

The Complaint's allegations that the Order is invalid because it violates OCSLA, Compl. ¶¶ 45-46, and conflicts with an alleged Presidential withdrawal of the Atlantic OCS from leasing, *Id.* ¶¶ 23-26, lack merit for at least four reasons. First, the State fails to plead a legally cognizable OCSLA claim. Second, there was no wholesale withdrawal of the Atlantic OCS from leasing in 2016; rather the President withdrew certain canyons from leasing, none of which are off the South Carolina coast. Third, the Complaint's arguments predicated on a withdrawal or a "moratorium" are factually and legally incorrect. Fourth, even if there were such a withdrawal, seismic surveys could still proceed in the Atlantic OCS. Moreover, these issues are irrelevant to NMFS's issuance of the IHAs or whether BOEM can issue seismic survey permits in the future.

**1. The Complaint's OCSLA Claims Must Be Dismissed**

The Complaint's OCSLA-based claims have two jurisdictional defects at the threshold. The Complaint's meager allegations in support of Claim 8 fail to satisfy the requirements of Rule 8(a). And the Complaint likewise fails to plead any facts showing there is a credible legal basis to bring challenges to OCSLA under Claims 1 and 8 when NMFS, the sole federal entity before this Court, has no role in administering OCSLA.

As an initial matter, Claim 8 of the Complaint lacks sufficient allegations to place Federal Defendants on notice of the State's OCSLA claim and must be dismissed because it provides no credible legal basis for any OCSLA cause of action. The Complaint alleges that "defendants' actions violate" OCSLA, Compl.¶ 46. The Complaint's barebones allegations of OCSLA violations are insufficient to satisfy the Supreme Court's holdings in *Twobly* and *Iqbal* that a "complaint must contain" "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 580; *see Iqbal*, 556 U.S. at 556. That is, the Complaint's conclusory assertion that some unspecified acts of Defendants violate OCSLA "are nothing more than the sort of unadorned allegations of wrongdoing to which *Twombly* and *Iqbal* are directed." *Francis v. Giacomelli*, 588 F.3d 186, 195–96 (4th Cir. 2009). On this ground alone, dismissal of Claim 8 is appropriate.

Moreover, the Complaint fails to articulate facts showing that the State is plausibly entitled to relief for Claims 1 and 8. *Iqbal*, 556 U.S. at 678. As there is no OCSLA final action, there can be no OCSLA claim before this Court. NMFS, the only federal agency named in the Complaint, issued the IHAs pursuant to the MMPA. NMFS does not administer OCSLA or otherwise implement oil and gas exploration or leasing on the OCS. Under OCSLA, the Secretary of the Interior is responsible for the exploration and development of the OCS, and BOEM is the entity within the Department of the Interior ("DOI") responsible for managing and regulating the OCS,

including oil and gas exploration, consistent with OCSLA.  30 C.F.R. §§ 550 and 551.  Neither

DOI nor BOEM are party to this suit.   The State cannot tether their OCSLA-based claims to any

agency action before this Court, asking instead that this Court engage in a theoretical analysis

about some alleged but unspecified OCSLA violation by parties not before the Court.  *See, e.g*., *In*

*re Elevator Antitrust Litig.,* 502 F.3d 47 (2d Cir.2007) (finding dismissal is appropriate because

the complaint "is nothing more than a list of theoretical possibilities, which one could postulate

without knowing any facts whatever"); *Robinson v. City of Columbia*, No. 3:15-1398-CMC-PJG,

2015 WL 7769233, at *2 (D.S.C. Nov. 5, 2015) (plaintiffs' factual averments must be more than

"speculative and conjectural conclusions"), *report and recommendation adopted*, 2015 WL

7776934 (Dec. 2. 2015).  The State cannot therefore plausibly assert any OCSLA-based claims

against NMFS and dismissal of its OSCLA-based causes of action is appropriate. Compl. ¶¶22-

26, 45-46.

## 2.  There was no wholesale withdrawal of the Atlantic OCS from leasing.

The Complaint's OSCLA-based claim challenging Executive Order 13,795 is also

factually and legally untenable.  Compl. ¶¶ 23-26.  No claim concerning the constitutionality of

OCSLA or the legality of Executive Order 13,795 is properly before this Court.

OCSLA provides that the President "may, from time to time, *withdraw from disposition*

any of the unleased lands of the [OCS,]" 43 U.S.C. § 1341(a) (emphasis added), thereby delegating

broad discretionary authority to the President.[4]  The Complaint's allegations that there has recently

---

[4] The President is not a party to this suit and yet the Complaint purports to challenge a
Presidential action, seeking to enjoin Order 13,795 as "unconstitutional" and "ultra vires".
Compl.  ¶¶ 23-26. The State cannot bring such a claim for injunctive relief against the President.
The separation of powers generally bars federal courts from issuing an injunction against
the President of the United States for official acts.  *See Franklin v. Massachusetts,* 505 U.S. 788,
802–03 (1992) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the
performance of his official duties.'" (citation omitted)); *Mississippi v. Johnson,* 71 U.S. (4 Wall.)

been a wholesale withdrawal under Section 12(a) of the Atlantic OCS, including off the South Carolina coast, from leasing and seismic survey activities is factually incorrect. Compl. ¶ 24.  In late 2016, the then President withdrew certain canyon areas that represent a very small portion of the Atlantic OCS.  Memorandum on Withdrawal of Certain Areas off the Atl. Coast on the Outer Cont'l Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Doc. 861 (Dec. 20, 2016); *see also* Compl. ¶ 24.  None of these withdrawn areas was off the South Carolina coast and the withdrawal was only from leasing, not survey activities.[5]  *Cf.* Compl. ¶ 25.  Although Executive Order 13,795 later modified the withdrawal of the canyons on the Atlantic OCS, it is irrelevant to South Carolina's concerns about the areas of the OCS off the South Carolina Coast. Exec. Order No. 13,795 § 5; *see also* Compl. ¶ 24.  Indeed, the Complaint makes no reference to the canyons.  *See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011) (statements of counsel raising new facts not within the four corners of the complaint may not be considered on a Rule 12(b)(6) motion).  For this reason, the Complaint's allegations about the constitutionality of Section 12(a) does not present a live controversy because, contrary to the Complaint's allegations, there were no areas withdrawn by the then President from *leasing* in 2016 off the South Carolina coast.[6]  The Complaint's allegations amount to no more than a request for

---

475, 500 (1866) ("Neither [the Congress nor the President] can be restrained in its action by the judicial department . . . ."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280-82 (D.D.C. 2005) ("The prospect of this Court issuing an injunction against the President raises serious separation of powers concerns.").

[5] A map of the areas the Atlantic Canyons withdrawn by virtue of the 2016 Order is available at: https://www.doi.gov/sites/doi.gov/files/uploads/targeted_atlantic_withdrawal_final_w_footprint_120916_1.pdf (last visited April 19, 2019).  As discussed above, this Court may take judicial notice of this publically available map published by BOEM.

[6] The Complaint's allegation that Section 12(a) of OSCLA violates the non-delegation doctrine because the Property Clause vests exclusive power in Congress to oversee property is misguided.  Although the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States[,]" U.S. CONST. ART. I, § 1, the Supreme Court "ha[s] recognized, however, that the separation-of-powers principle, and the non-delegation doctrine in particular,

an advisory opinion from the Court. Accordingly, the Court need not, and indeed should not, address the State's contentions in this regard. *See, e.g., City of Fredericksburg v. Fed. Energy Regulatory Comm.*, 876 F.2d 1109, 1113 (4th Cir. 1989) ("[O]ur resolution of the issue at the present time would amount to nothing more than an advisory opinion, which we have no authority to render.").

### 3. A withdrawal does not preclude survey activities.

Further, the withdrawal of an area of the OCS from leasing does not legally preclude survey activity. Entities seeking to conduct geological and geophysical surveys can obtain a permit in *any* area of the OCS, including those areas that have been withdrawn from leasing. *See* 43 U.S.C. § 1340; 30 C.F.R. pt. 551. The withdrawal authority in Section 12(a) of OCSLA applies only to disposition of minerals; whereas Section 8 of OCSLA only applies to geological and geophysical surveys for minerals, not their disposition. Thus, even if a withdrawal were in place, it could have

---

do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States,* 488 U.S. 361, 372 (1989). "Congress may, and routinely does, delegate authority to the Executive Branch to implement legislative policy[,]" *United States v. Burns,* 418 F. App'x 209, 211 (4th Cir. 2011), so long as it supplies an "intelligible principle" defining the limits of that discretion. *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)). Section 12(a) of OSCLA satisfies this standard. Here, although Section 12(a) confers broad authority on the President, it also provides intelligible limits: the lands must be unleased and the withdrawal authority is only from "time to time." Thus, the non-delegation doctrine is not violated, nor is the Property Clause, which courts have repeatedly construed as allowing Congress to delegate its authority to the executive and judicial branches. *See Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002); *Sabin v. Berglund*, 585 F.2d 955, 958 (10th Cir. 1978) (finding that Congress may delegate its plenary power over public lands to the Secretary of Agriculture). Moreover, South Carolina does not point to any injury flowing from the exercise of that authority to withdraw from disposition any portion of the OCS near South Carolina, by any president at any time. To the contrary, the Complaint seeks to have the Court vacate a modification of such a withdrawal — in areas of Alaska and the Atlantic canyons far to the north and nowhere near to South Carolina's coastline. South Carolina does not claim injury from the exercise of what it asserts is an insufficiently bounded delegation of authority to withdraw from disposition and it therefore lacks standing to raise such a claim.

no legal effect on the BOEM's authorization of such surveys (should such authorizations occur), which are authorized under a specific section of OCSLA separate from the sections of OCSLA that govern the issuance of leases and the management of mineral exploration and development. *Compare* 43 U.S.C. § 1337 *with* 43 U.S.C. § 1340. Because the proposed surveys could proceed even if there were a withdrawal of the Atlantic OCS from leasing, the State's challenge to the surveys based on the alleged existence of a withdrawal is untenable.[7]

### C.    The State's Public Nuisance And Trespass Claims Should Be Dismissed.

The State's public nuisance and trespass claims should be dismissed because they suffer from numerous fatal defects. As described below, these common law tort claims are barred by sovereign immunity, are not a cognizable claims, are displaced by other statutes and, even if they were judicially cognizable, would fail on the merits.

### 1.    The United States has not waived its sovereign immunity with respect to the State's tort claim.

The United States and its agencies may not be sued unless there is a valid waiver of sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). A claim seeking to abate a public nuisance is a tort claim seeking injunctive relief, RESTATEMENT (SECOND) OF TORTS § 821B (Am. Law. Inst. 1979), and, indeed, that is the very relief that the State requests through its Complaint in Intervention. A claim alleging trespass is also a tort claim, *id.* §§ 158, 165, 821D, and apparently the State also seeks injunctive relief as for claim. The State relies on the APA's waiver of sovereign immunity for claims against the United States seeking relief other than money

---

[7] For these reasons, any argument that the State may make that the Order impermissibly alters the preceding Administration's moratorium on oil and gas development in conflict with the Supreme Court's holding in *State Farm* also fails. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As an initial matter, NMFS is not the entity responsible for any moratorium. And, unlike in *State Farm*, there was no subsequent final rulemaking here where the agency reversed course without reasoned explanation. *Id.*

damages. *See* Compl. ¶ 13 (incorporating by reference *City of Beaufort* Complaint ¶¶ 32-34 (ECF No. 1)); 5 U.S.C. § 702. But that waiver expressly does *not* "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* Here, another statute, the Federal Tort Claims Act ("FTCA"), impliedly forbids courts from issuing injunctive relief against the United States in tort cases. 28 U.S.C. § 1346(b)(1). For this reason, the State cannot rely on the APA's waiver of sovereign immunity to bring its claims for public nuisance and trespass against Federal Defendants.

The FTCA defines the scope of the tort liability of the United States and its instrumentalities. 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674.[8] In enacting the FTCA, Congress placed two limitations on the statute's waiver of sovereign immunity that forbid the relief sought in this case and, therefore, removed these claims from the scope of the APA's sovereign immunity. First, the FTCA's waiver is limited to actions for money damages and "[t]o the extent that [plaintiff] is seeking other relief, [the court] lack[s] jurisdiction under the FTCA to accord it." *Talbert v. United States*, 932 F.2d 1064, 1066-67 (4th Cir. 1991); 28 U.S.C. § 1346(b)(1). Congress enacted the FTCA against a backdrop of no waiver of sovereign immunity for tort claims, and it limited the FTCA's waiver of sovereign immunity to claims for money damages. The FTCA does not purport to eliminate the United States' sovereign immunity for other kinds of claims. Therefore, as the Fourth Circuit has held, it does not permit tort claims against federal agencies for relief other than money damages. *Talbert*, 932 F.2d at 1066-67.

---

[8] In light of the State's failure to initiate their claims pursuant to the FTCA, Federal Defendants do not address the deficiencies in the State's case under that statutory framework, including the State's failure to file an administrative claim or the discretionary function exception to the United States' waiver of sovereign immunity.

Second, the FTCA does not permit claims against the United States that are based solely on federal common law, such as the public nuisance claim that the State presses here.[9]  The FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place* where the act or omission occurred."  28 U.S.C. § 1346(b)(1) (emphasis added).  That "law of the place" language has universally been interpreted to mean that the FTCA's waiver is limited to tort claims recognized under the law of the state where the act or omission occurred. *E.g., F.D.I.C.*, 510 U.S. at 478 ("[W]e have consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State — the source of substantive liability under the FTCA"); *Williams v. U.S.*, 242 F.3d 169, 173 (4th Cir. 2001) (it is a "universally accepted position that the 'law of the place,' as used in the FTCA, refers to state and local law, not federal law"). The Supreme Court has expressly held that the FTCA's waiver of sovereign immunity does not extend to claims based on federal common law.  *See F.D.I.C.*, 510 U.S. at 478 (holding that where "federal law, not state law, provides the source of liability" the United States "simply has not rendered itself liable"). To allow the State to press forward with its common law claims would be to allow it to circumvent the carefully constructed limitations on suits set forth in the FTCA through artful pleading.  The APA prohibits this result. 5 U.S.C. § 702.

The Court should reject any attempt by the State to argue that this Court should follow other circuits that have held that the APA waives sovereign immunity for common law nuisance claims.  For example, in *Michigan v. U.S. Army Corps of Engineers ("Michigan I")*, 667 F.3d 765,

---

[9]   The State's trespass claim does not specify whether it relies on federal common law, Compl. ¶ 44, which is itself an independent reason supporting dismissal.  *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . .").

774-76 (7th Cir. 2011), the Seventh Circuit held that the waiver in APA Section 702 is not limited to claims brought pursuant to the review provisions contained in the APA itself. Rather, the Seventh Circuit held that "[t]he waiver applies when any federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under federal law." *Id*. at 775 (citing *Blagojevich v. Gates*, 519 F.3d 370 (7th Cir. 2008). The Ninth Circuit reached a similar conclusion in addressing the question of whether a litigant could avail itself of Section 702's waiver of sovereign immunity where no final federal agency action was involved. *Navajo Nation v. U.S. Dep't of Interior*, 876 F.3d 1144 (9th Cir. 2017). The Ninth Circuit held that the second sentence of Section 702 operates independently from the first sentence and provides a waiver of sovereign immunity that applies to non-monetary claims against the United States, including non-APA claims, i.e., those not eligible for the right of action provided by the first sentence of Section 702. *Id*. at 1170-72. Federal Defendants' argument here focuses on the fourth sentence of Section 702 and contends that claims against agency action and inaction alleging a tort claim are precluded by the FTCA. *Navajo Nation* does not address this point.

In addition to being non-binding and unpersuasive, these cases from other circuit courts are clearly distinguishable. Here, there is no dispute that the APA provides a waiver of sovereign immunity for the State's ESA, MMPA and NEPA claims against NMFS for issuance of the IHAs, in which it is limited to the remedies provided by the APA.[10] 5 U.S.C. § 702. In other words, the APA creates a comprehensive remedial scheme for the alleged harm to the State from agency action. 5 U.S.C § 706(2) (providing the circumstances under which a reviewing court shall set aside actions). Because the State's nuisance and trespass claims are common law tort claims, the

---

[10]   The APA also provides a waiver of sovereign immunity for claims that are brought pursuant to OCSLA, assuming that they are brought against a proper defendant, which they are not here. *See* Section B, *supra*.

FTCA forbids the relief sought and the APA's waiver of sovereign immunity does not apply. 5 U.S.C. § 702(2).

### 2. There is no cognizable federal common law public nuisance or trespass claim against NMFS.

Even if the United States had waived its sovereign immunity to public nuisance and trespass claims, the State has not provided a legal basis for recognizing a federal common-law public nuisance and trespass claims against a federal agency that is operating pursuant to statutory mandates. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois & Michigan* (*Milwaukee II*), 451 U.S. 304, 312 (1981). Thus, the Supreme Court has found it necessary to develop federal common law only "in a 'few and restricted' instances . . . ." *Id.* at 313 (quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)). And even where such a federal common-law cause of action has been recognized, it may be displaced by congressional action to address the problem. *Id.*

A federal common-law claim is not appropriate where a plaintiff seeks relief that would address the same issue, but in a manner different in character or extent from what the regulatory program provides. *See Milwaukee II*, 451 U.S. at 324 ("The question is whether the field has been occupied, not whether it has been occupied in a particular manner." (citation omitted)); *see also Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623-25 (1978) (holding that federal statute may displace federal common law even when the statute provides less or narrower relief). Courts may not substitute their judgment, under the guise of federal common law, for the scientific and policy determinations made by federal agencies as to how, when, and whether regulation is appropriate. When applied to this case, these principles demonstrate that the State's public nuisance and trespass claims are wholly inappropriate.

Here, the IHAs were issued after extensive statutory and regulatory processes spanning many years, with analyses performed pursuant to NEPA, the ESA, and the MMPA, and multiple, notice and comment periods.  83 Fed. Reg. at 63,268.  The IHAs are supported by a thorough and extensive BiOp prepared pursuant to ESA Section 7, an EA tiering to a comprehensive PEIS prepared in accordance with NEPA, and a full administrative record.  These analyses rigorously explored and evaluated the potential effects of the proposed seismic surveys on protected species and their habitat and culminated in the development of a comprehensive suite of effective mandatory avoidance, minimization, and mitigation measures to protect species as the surveys are carried out.  These facts alone demonstrate that no federal common law action is warranted.  Courts must "start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *Milwaukee II*, 451 U.S. at 317 (internal quotation marks omitted).  That assumption is borne out here:  Congress has mandated that if the relevant MMPA standards are satisfied, NMFS must issue IHAs for the specified activity, subject to the requirements of the statute. 16 U.S.C. § 1371(a)(5)(A)(i).  Whether NMFS's action was lawful and reasonable is a question that should be decided under the standards established by the MMPA and informed by the APA, not federal common law.

Any reliance by the State on out-of-circuit cases, holding that it is possible to state a public nuisance claim against an agency of the federal government, is misplaced. *E.g.*, *Michigan v. U.S. Army Corps of Eng'rs* (*Michigan II*), 758 F.3d 892, 900-01 (7th Cir. 2014).  The *Michigan II* decision recognized the novelty of its holding and admittedly rested only on the proposition that "[f]ederal agencies have appeared as defendants in public nuisance suits before."  *Id*. at 902. Moreover, the *Michigan II* decision involved affirmative acts by federal defendants that directly caused the alleged harm — i.e., the construction and operation of the Chicago Sanitary Ship Canal

that allowed for the migration of the Asian carp — not a permitting decision that is at least one step removed from the alleged nuisance.  Citing two Supreme Court decisions in which federal agencies were sued for causing a public nuisance, the Seventh Circuit held that the Supreme Court's "silence" on whether a public nuisance cause of action exists "suggest[ed] that the Court saw no sweeping, easy-to-apply rule that would exempt the entire federal government . . . from liability under the federal common law of public nuisance." *Id.*[11] This Court should not interpret the Supreme Court's "silence" in a similar manner, particularly where (as here) multiple statutes provide relief for the same issues raised in the State's public nuisance and trespass claims.  *E.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("Nor have we ever held that a State may sue to abate any and all manner of pollution originating outside its borders[,]" and stating that it is an "academic question" whether in the absence of the Clean Air Act, a plaintiff could state a federal common law claim for curtailment of greenhouse gas emissions).  Put another way, "there is no room for courts to attempt to improve" on the comprehensive programs established by the multiple federal statutes at issue in this case with federal common law.  *Milwaukee II*, 451 U.S. at 319.

### 3.  Congress has displaced federal common law.

Even if a federal common law cause of action for public nuisance or trespass existed, Congress has displaced such claims on the issues presented in the State's lawsuit:  the authorization of take of marine mammals incidental to specified activity pursuant to the MMPA; the authorization of take of species listed as threatened and endangered incidental to specified activity

---

[11]   Indeed, in *Middlesex Cty Sewerage Auth. v. Nat. Sea Clammers Ass'n*, 453 U.S. 1, 11 n.17 (1981), the Supreme Court expressly stated that it was not discussing the question whether the federal common law of nuisance could ever be the basis of a suit for damages by a private party. The Seventh Circuit's holding ignores this plain statement.

pursuant to the ESA; and the effects of specified activity on the human environment pursuant to NEPA.[12]  In short, there are multiple comprehensive statutory and regulatory schemes that govern the questions at issue in this case, thus preempting and displacing the State's federal common law nuisance claim.

The Supreme Court has clarified that the "test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue." *Am. Elec. Power*, 564 U.S. at 424 (internal quotation and alteration marks omitted; citation omitted). A "statute speaks directly" to the question at issue if it delegates authority to an agency to resolve that question; it is not necessary that either Congress or the agency have resolved the question comprehensively or in the way that the plaintiff seeks. *Id*. at 425, 426 ("[T]he delegation is what displaces federal common law.").

Here, the State seeks, among other things, an injunction prohibiting the five seismic surveys from occurring "without compliance with the MMPA, ESA, NEPA and APA," as well as a declaratory ruling that "seismic airgun surveying authorizations are in violation of the [MMPA, ESA, NEPA, OCSLA, and/or APA]." Compl., Prayer for Relief ¶¶ B,C.[13]  But the same statutes that underlie other claims set forth in the State's Complaint in Intervention – the ESA, the MMPA, and NEPA – speak directly to the question of whether NMFS authorized to the IHAs in a legally permissible manner and, in fact, are invoked directly by the State.  *See Michigan II*, 758 F.3d at 901 (noting that there is "displacement of federal common law when Congress has spoken directly

---

[12]   While not properly before this Court, as BOEM has not yet taken final action and the agency is not a party, the future issuance of G&G permits would be reviewed according to OCSLA, as directed by Congress.

[13]   Notably, the authorization of the surveys is not an act that it is attributable to NMFS because it does not authorize seismic testing.  That action, which relates to the issuance of permits for the survey activities themselves, requires authorizations by BOEM under OCSLA, and BOEM is not a defendant in this lawsuit.

to the question at issue"). That is, Congress delegated to NMFS the authority to decide whether the five companies seeking to conduct the survey activity have satisfied the requirements set forth in the MMPA and the ESA regarding the incidental take of marine mammals and threatened and endangered species. 16 U.S.C. § 1362(12)(A) (defining "Secretary" for the purposes of the MMPA as the Secretary of the Department in which NOAA is operating, and the Secretary of the Interior); 16 U.S.C. § 1371(a)(5)(A)(i) (outlining Secretary's role in the issuance of authorizations for incidental taking of marine mammals upon making certain specified findings); 16 U.S.C. § 1532(15) (defining "Secretary" to mean the Secretary of the Department of Interior or the Secretary of Commerce); 16 U.S.C. § 1536(a)(2) (outlining Secretary's role overseeing the consulting agency for the purposes of ESA Section 7 consultation). Congress also directs NMFS, in its capacity as the authorizing agency, to assess whether the IHAs would result in significant impacts to the human environment under NEPA. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.13.

Unlike the question before the Seventh Circuit in *Michigan I*, these statutes speak directly to the questions at issue. *Cf. Michigan I*, 667 F.3d at 780 ("Congress has not passed any substantive statute that speaks directly to the interstate nuisance about which the states are complaining . . . . Tellingly, Congress has not provided any enforcement mechanism or recourse for any entity or party negatively affected by carp, and there is certainly no recourse to the courts under the minimal scheme that has been established."). Therefore, the Court should find that the State's public nuisance and trespass claims are displaced by the ESA, MMPA, and NEPA.

4.  **The State's public nuisance and trespass claims fail to state claims on which relief can be granted.**

The fatal defects in the State's public nuisance and trespass claims set out above are sufficient for the Court to dismiss them on jurisdictional grounds. But in addition to Federal

Defendants' arguments on these points, the State's public nuisance and trespass claims fail to state a claim on which relief can be granted.[14]

### a. Public nuisance

"[P]ublic nuisance is an all-purpose tort that encompasses a truly eclectic range of activities." *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301 (4th Cir. 2010). The Fourth Circuit has described public nuisance as encompassing "broad-ranging offenses" involving the public health and safety (i.e., "the keeping of diseased animals" or "harboring a vicious dog"); the public morals (i.e., "illegal liquor establishments"); the public peace (i.e., "as by loud and disturbing noises"); the public comfort (i.e., "bad odors"); the public convenience (i.e., "obstructing a highway or navigable stream") and other "unclassified offenses." *Id.* at 301-302; *see also* RESTATEMENT (SECOND) OF TORTS § 821B (1979) (public nuisance is defined as a "substantial" or "unreasonable interference with a right common to the general public" usually with "public health, the public safety, the public peace, the public comfort or the public convenience); *Greenberg Inv. P'hip, L.P. v. Cary's Lake Homeowners' Ass'n*, No. 3:15-cv-05096-JMC, 2016 WL 2766675, at *6 n.5 (D.S.C. May 13, 2016).

The Fourth Circuit also has explained that "[c]ourts traditionally have been reluctant to enjoin as a public nuisance activities which have been considered and specifically authorized by the government." *North Carolina*, 615 F.3d at 309 (quoting *New England Legal Found. v. Costle*, 666 F.2d 30, 33 (2d Cir. 1981)). This is especially true where the conduct sought to be enjoined implicates the technically complex area of environmental law. *Id.* This is because actions that are

---

[14]   The State's complaint also apparently seeks to press a claim for public nuisance under South Carolina law.  Compl. ¶ 40.  The IHAs were issued pursuant to law, while public nuisances "always arise out of unlawful acts." *Winley v. Int'l Paper Co.*, No. 2:09-2030-CWH, 2012 WL 13047989, at *7 (D.S.C. Oct. 23, 2012) (citing *State v. Turner*, 18 S.E.2d 372, 375 (S.C. 1942)).

authorized by statute are reasonable and thus, by definition, fall outside the realm of public

nuisance. *See* RESTATEMENT (SECOND) OF TORTS § 821B cmt. f ("Although it would be a nuisance

at common law, conduct that is fully authorized by statute, ordinance or administrative regulation

does not subject the actor to tort liability."); *see also Michigan II*, 758 F.3d at 901 ("When

Congress passes a statute, it weighs the competing public interests that would be served.  Activities

commanded or authorized by that statute reflect the public interest and so cannot be *unreasonable*

intrusions on a public right.").   As a threshold matter, NMFS's issuance of the IHAs were

authorized by the MMPA, and supported by thorough analyses under the ESA and NEPA.  *See*

Section II.D, *supra*.  Furthermore, NMFS itself is not carrying out any survey activity, nor has it

authorized any survey activity.  Only BOEM has authority over seismic survey applications under

OCSLA. Thus it is hardly surprising that the Complaint in Intervention fails to explain precisely

how NMFS is unreasonably interfering with a public right.[15]  As explained by the Fourth Circuit,

"it is difficult to understand how an activity expressly permitted and extensively regulated by . . .

[the] federal . . . government could somehow constitute a public nuisance."  *North Carolina*, 615

F.3d at 296.

The State's Complaint in Intervention fails to state a claim on which relief can be granted.

The State has not identified any act of <u>Federal Defendants</u> that has interfered with the ownership

or use of its lands.  To the contrary, the challenged actions here are NMFS's issuance of the IHAs,

---

[15]  Even if it were proper for the State to rely on BOEM's potential issuance of the permits
themselves, which it is not, the IHAs prohibit survey activity within 30 km from shore. 83 Fed.
Reg. at 63,275.  This coastal closure clearly protects any interest that the State has in its
submerged lands, which extend only three miles from shore pursuant to the Submerged Lands
Act.  43 U.S.C. § 1301(a)(2) (lands subject to that statute are "all lands permanently or
periodically covered by tidal waters up to but not above the line of mean high tide and seaward
to a line three geographical miles distant from the coast line of each such State . . . .").  The
ocean beyond the three-mile limit is the domain of the United States, subject to the nation's
"jurisdiction and control." 43 U.S.C. § 1302.

which do not authorize any survey activity, do not interfere with any right common to all members of the general public, and is simply not an act that gives rise to a public nuisance claim. "The ancient common law of public nuisance is not ordinarily the means by which such major conflict among governmental entities are resolved in modern American governance." *North Carolina*, 615 F.3d at 301 (citation and internal quotations omitted). The State's public nuisance claim suffers from significant defects, and the State fails to state a claim for this "ill-defined omnibus tort of last resort. . . ." *Id*. at 302.

### b. Trespass

As a threshold matter, the State provides no information at all about the basis for its trespass claim, stating only that "defendants' action constitute a trespass against the State of South Carolina, owner of the adjacent lands under the Submerged Lands Act, 43 U.S.C. § 1301 et seq." Compl. ¶ 44. This bare allegation hardly satisfies the pleading standards set forth in Rule 8, and is exactly the sort of "threadbare recital" rejected by *Twombly* and *Iqbal*. Even if the Court found that the allegations were sufficiently plead, it is evident that the Complaint in Intervention fails to state a claim on which relief can be granted for trespass.

"Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Coll. of Charleston Found. v. Ham*, 585 F. Supp. 2d 737, 750 (D.S.C. 2008) (quoting *Hedgepath v. Am. Tel. & Tel. Co.,* 559 S.E. 2d 327, 337 (S.C. Ct. App. 2001)). "For a trespass action to lie, 'the act must be affirmative, the invasion of the land must be intentional, and the harm caused by the invasion of the land must be the direct result of that invasion.'" *Coll. of Charleston Found*., 585 F. Supp. 2d at 750 (quoting *Hawkins v. City of Greenville,* 594 S.E. 2d 557, 566 (S.C. Ct. App. 2004) (quoting *Mack v. Edens,* 464 S.E. 2d 124, 127 (1995)). Further, "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing

for a trespass to exist. . . ." *Babb v. Lee County Landfill SC, LLC*, 747 S.E. 2d 468, 476 (2013). "Under [the traditional] rule, intangible matter or energy, such as smoke, noise, light, and vibration, are insufficient to constitute a trespass." *Id*. at 477. The allegations against Federal Defendants set forth in the State's Complaint are in for with these principles.

First, as previously explained, *see* Section B, *supra*, NMFS's issuance of the IHAs does not authorize any survey activity. To the contrary, the IHAs authorize the take of marine mammals incidental to survey activity. 83 Fed. Reg. 63,268 (Dec. 7, 2018). Further, Federal Defendants will not be conducting any survey activity themselves, thus the Complaint contains no allegations that Federal Defendants have taken (or will take) any action to affirmatively, physically intrude the State's lands. Indeed, as explained above, the IHAs prohibit survey activity within 30 km from shore, 83 Fed. Reg. at 63,275, thus any survey activity must occur outside this coastal closure and outside of the State's submerged lands, which extend only three miles from shore pursuant to the Submerged Lands Act. 43 U.S.C. § 1301(a)(2). *See* n.15, *supra*. Finally, the activity at issue, even though not authorized by Federal Defendants, cannot form the basis of a trespass claim. The State's Complaint contends that survey activity will produce "extreme loud noises." Compl. ¶ 3. But as the South Carolina Supreme Court explained in *Babb*, intangible energy in the form of noise or vibration are insufficient to constitute a trespass. *Babb*, 747 S.E. 2d at 477. These multiple, overlapping defects in the State's trespass claim are insurmountable, and the Court should dismiss this count of the Complaint.

### D.  The Complaint Fails to Plead a Legally Cognizable Admiralty Claim.

The State's admiralty cause of action fails for at least two reasons. First, the State's admiralty claim fails at the threshold because the Complaint contains no more than "threadbare recitals" of liability, failing to meet the pleading standards articulated by the Supreme Court in

*Iqbal* and *Twombly*. *See supra* at Section III.  Second, even if the Complaint satisfied the threshold pleading requirements of Rule 8(a) to a state claim generally, it fails to specify any basis for admiralty jurisdiction more specifically.  "[T]he test for admiralty tort jurisdiction requires that an incident (1) must satisfy the locality test; and (2) show a connection between the incident and maritime activity. To meet the location test, the tort must occur on navigable waters, or, if suffered on land, at least be caused by a vessel on navigable water. *Jerome B. Grubart, Inc. v. Great Lakes Dredge and Dock Co*., 513 U.S. 527, 533-35 (1995). Additionally, in order to satisfy the requisite connection test, the facts giving rise to the wrong must bear a sufficient connection to maritime activity. *Id.* This inquiry requires that the court first determine whether "the general features of the type of incident involved" have "a potentially disruptive impact on maritime commerce," and second, "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id*. (quoting *Sisson v. Riby*, 497 U.S. 358, 365, 364 n. 2 (1990) (quotation marks omitted); *White v. United States*, 53 F.3d 43, 45–46 (4th Cir. 1995). The State fails to allege facts sufficient to pass these tests.

### 1. The Complaint's Recitation of the State's Admiralty Claim Fails to Satisfy Rule 8(a).

As an initial matter, the State bases its admiralty claim on one threadbare allegation: that the actions alleged in the Complaint violate "maritime law" and "constitute a tort under the admiralty jurisdiction of the United States and this Court." Compl. ¶48 (citing 28 U.S.C. § 1333).[16] This cursory allegation, merely citing a violation of "maritime law," fails to satisfy the minimum pleading standards articulated by the Supreme Court in *Iqbal* and *Twombly,* which do not require

---

[16] 28 U.S.C. § 1333 provides in relevant part: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  Notably, the Complaint does not invoke Section 1333 in its statement of jurisdiction.  Compl. ¶ 13.

"detailed factual allegations," but demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Here, and fatal to its claim, the State has not "nudged [its] claims" of a maritime tort "across the line from conceivable to plausible." *Id.*, 556 U.S. at 680.  That is, the State relies on unadorned, the-defendant-unlawfully-harmed-me claims that do not satisfy the pleading requirements of Rule 8(a).  Dismissal of the State's admiralty claim is therefore appropriate.

### 2.  The Complaint Fails To Plead An Admiralty Claim.

In addition to these threshold pleading defects, the State also fails to plead particularly the requisite facts to support admiralty jurisdiction.  Federal courts exercise admiralty jurisdiction in certain limited circumstances.  *See generally* Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW, ch. 3 (Prac. ed.1 987).  The State fails to allege, as it must, that there was a tort on navigable waters or a nexus with traditional maritime activity.

### a.  No tort on navigable waters is alleged.

The State first fails to show that there was a tort on navigable waters.  The challenged acts are those of federal actors on land, in particular NMFS's action to authorize the IHAs.   The Complaint contains no allegations explaining how NMFS's administrative act of issuing the IHAs from its office in Maryland is tantamount to a *maritime* tort.  While the State may argue that the IHAs are a legal prerequisite to the proposed surveys themselves, this fact alone does not transform a challenge to administrative action into a maritime tort claim. The State challenges NMFS's analysis, interpretations, and conclusions to support the authorizations, but make no allegations that would be cognizable in a maritime context.  *See e.g.*, *Higgins v. Leland*, 839 F. Supp. 374, 375 (D.S.C. 1993) (noting that Fourth Circuit has held that for the jurisdictional inquiry, "we must look to the place where the incident occurred which ultimately gave rise to the cause of action.")

(quoting *Whittington v. Sewer Construction Co., Inc.,* 541 F.2d 427, 432–433 (4th Cir. 1976)); *White*, 53 F.3d at 47 (same). Nor can the State credibly contend that the proposed surveys themselves satisfy the locality test because vessels on navigable waters would cause its alleged harms; this argument also misses the mark. Under Fourth Circuit precedent, the locality test require traditional tort law "proximate causation." *See e.g.*, *Pryor v. Am. President Lines*, 520 F.2d 974, 979 (4th Cir .1975). But NMFS itself is neither conducting nor authorizing any surveys and it is not the entity with the mandate to do so.

NMFS's issuances of the IHAs is therefore insufficient to demonstrate that an "injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 527. Any alleged proximate cause relationship here is implausible: the causal link between NMFS's issuance of the IHAs and any potential harms to the State arising from the proposed survey activities is too far removed to support the locality test. *See In re Madison Coal & Supply Co.*, 321 F. Supp. 2d 809, 813 (S.D. W. Va. 2003), *aff'd sub nom. M/V DREMA G. WOODS v. Johnson*, 97 F. App'x 449 (4th Cir. 2004). Indeed, if that type of indirect effect were sufficient to find that a tort "occurred on navigable water[,]" *Grubart,* 513 U.S. at 534, maritime jurisdiction would extend to any injury at sea with some connection to a federal agency action, no matter how remote. The Complaint references no authority that would expand admiralty jurisdiction so dramatically.

**b. No maritime nexus is alleged.**

The State further fails to allege a maritime nexus between the challenged acts and traditional maritime activity. *See Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 269-70 (1972). As the Supreme Court explained in *Executive Jet*, "[t]he law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go." *Id*. at 269-70. The Court listed

28

the typical types of admiralty cases: "the law of the sea . . . is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage." *Id*. at 270. The present case does not allege a maritime tort or supply any other basis for the exercise of admiralty jurisdiction. NMFS's administrative act of authorizing the IHAs "is not about piloting, shipping, or navigational error, or other aspects of traditional maritime activity. There is simply no predicative relationship upon which an otherwise typical tort claim may properly be described as relating to 'matters with which admiralty is basically concerned.'" *Foster v. Peddicord*, 826 F.2d 1370, 1376 (4th Cir. 1987) (citing *Exec. Jet*, 409 U.S. at 270). For this reason as well, the State has failed to plead the jurisdictional prerequisites for asserting an admiralty claim and its claim must be dismissed.

## V.    CONCLUSION

For the reasons stated above, this Court should dismiss Claims 1, 6, 7 and 8 of the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

.
 Respectfully submitted this 22nd day of April, 2019.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

By:  _/s/ Alison Finnegan_
ALISON C. FINNEGAN, Trial Attorney
JONELLE DILLEY, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax: (202) 305-0275

Email: alison.c.finnegan@usdoj.gov
Email: Jonelle.Dilley@usdoj.gov

/s/ *Marissa Piropato*
MARISSA A. PIROPATO
Sr. Trial Attorney, MA Bar No. 651630
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel | (202) 305-0470
Fax | (202) 305-0506
Email: marissa.piropato@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2019, I electronically filed the brief with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.


   /s/ *Marissa Piropato*